1    **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9

10   Anthony Marshall Spears,              )    No. CV-00-1051-PHX-SMM
                                           )
11            Petitioner,                  )    <u>DEATH PENALTY CASE</u>
                                           )
12   vs.                                   )
                                           )
13   Charles L. Ryan, et al.,[1]           )    **MEMORANDUM OF DECISION**
                                           )              **AND ORDER**
14            Respondents.                 )
                                           )
15   _____       )

16

17        Petitioner Anthony Marshall Spears is a state prisoner under sentence of death. Before

18   the Court is Petitioner's First Amended Petition, which raises twenty claims for habeas relief.

19   (Dkt. 79.)[2] Pursuant to the Court's general procedures governing resolution of capital habeas

20   proceedings, the parties have completed briefing of both the procedural status and the merits

21   of Petitioner's habeas claims. In a previous Order, this Court denied Petitioner's motion for

22   discovery, evidentiary hearing, and an expansion of the record, and further denied a number

23   of claims. (*See* Dkt. 120.) In this Order, the Court addresses Petitioner's remaining claims

24   and concludes that he is not entitled to relief.

25   _____

26        [1]    Charles L. Ryan is substituted for Dora B. Schriro, as Director, Arizona
     Department of Corrections. Fed. R. Civ. P. 25(d)(1).

27
          [2]    "Dkt." refers to the documents in this Court's file.
28

# FACTUAL AND PROCEDURAL BACKGROUND

The Arizona Supreme Court summarized the facts surrounding the crime and Petitioner's arrest and conviction as follows:

> Defendant lived near San Diego, California with his girlfriend JoAnn. Defendant had no income, so JoAnn supported him. Defendant had another female acquaintance in Phoenix named Jeanette (the victim) whom he had visited several times. Jeanette referred to defendant as her boyfriend and talked about their future plans together.
>
> The state presented evidence that, in late December 1991, Jeanette apparently began getting ready to take a trip with defendant. She had her 1984 Dodge Rampage truck serviced on December 27. Shortly thereafter, she requested an extended family leave from her employer. On January 2, 1992, defendant flew from San Diego to Phoenix, using a one-way plane ticket that Jeanette had purchased for him. Before leaving California, defendant told JoAnn that he was going to Phoenix to work on some airplanes for 3 or 4 days. Defendant brought a 9mm Beretta handgun with him to Phoenix.
>
> The day that defendant arrived in Phoenix, Jeanette used her Mastercard to get a $700 cash advance, and she bought a watch and sleeping bag at Target. The next day, January 3, she got a $1000 cash advance using her Mastercard and a $500 cash advance using her Discover card. Later that day, defendant accompanied Jeanette to the bank where she had the title to her truck notarized, which made the title readily transferrable. No evidence indicates that Jeanette was alive after January 3.
>
> On January 4, defendant wrote the following on a notepad that he kept on his gun cabinet: "To anticipate death is worse than death itself. Only a matter of time." That same day he drove back to California in Jeanette's truck and arrived at JoAnn's around 10:30 p.m. Defendant told JoAnn that he bought the truck from an older couple for $3000. Upon his arrival, he had approximately 5 guns, some of which matched those belonging to Jeanette, two sleeping bags, and almost $1000 in cash. Defendant immediately purchased a gun cabinet upon his return. He put his 9mm Beretta in the cabinet, and it remained there until police seized it on January 25.
>
> On January 19, a family was target shooting in a desert area near Ellsworth and Elliot Roads in Maricopa County when they discovered Jeanette's body and notified the police. Jeanette was wearing the same shirt she had on when a bank camera photographed her on January 3. The autopsy revealed that Jeanette had died from a gunshot wound to the back of her head with a medium or large caliber bullet. Based on the decomposition of her body and the weather conditions, the medical examiner opined that she could have been dead for 2 to 3 weeks by the time her body was discovered. On January 30, 11 days after Jeanette's body was found, police discovered at the scene a shiny 9mm shell casing later identified as having been fired from defendant's 9mm Beretta handgun.
>
> While searching Jeanette's home, the police discovered that her truck was missing. They also found a TV Guide open to January 3 and a receipt for the plane ticket that Jeanette had purchased for defendant. After getting defendant's name from the receipt, the police traced him to the San Diego area. On January 24, the Mesa Police Department telephoned the San Diego County Sheriff's

Department to advise them that Jeanette was dead, her truck had been stolen, and defendant was a possible suspect. The Mesa police later sent an "attempt to locate" facsimile to San Diego confirming the phone conversation. The San Diego County sheriff arranged for surveillance of defendant's apartment complex. The deputies took defendant into custody when he arrived home on January 25 driving Jeanette's truck. Upon his arrest, defendant claimed to have a valid title to the truck in the glove compartment, but a brief search revealed none. Mesa police officers later processed the truck, and they in fact found in the glove compartment the title that Jeanette had notarized on January 3, and on the back of that document defendant's name was written in the space designated for the purchaser to whom the title was being reassigned. Jeanette signed the back of the title in blue ink on January 3 in the presence of the notary, and defendant's name was written in black ink and dated January 1. At the time of his arrest, defendant had not registered the truck in California.

*State v. Spears*, 184 Ariz. 277, 282-83, 908 P.2d 1062, 1067-68 (1996).

A jury convicted Petitioner of theft and first degree premeditated murder, and Maricopa County Superior Court Judge Cheryl K. Hendrix sentenced him to death for the murder and a term of imprisonment for the theft. On direct appeal, the Arizona Supreme Court affirmed. *See Spears*, 184 Ariz. 277, 908 P.2d 1062. Subsequently, the United States Supreme Court denied a petition for writ of certiorari. *Spears v. Arizona*, 519 U.S. 967 (1996).

Following denial of certiorari, the Arizona Supreme Court did not immediately issue the mandate in this case because post-conviction counsel was unavailable. (*See* Dkt. 43 at 3-4.) In 1997, uncertain whether Arizona's delay in initiating state post-conviction proceedings would adversely affect his ability to later seek federal habeas relief, Petitioner filed an initial habeas application, a motion to appoint counsel, and a request for equitable tolling of the statutory limitations period. *See Spears v. Stewart*, No. CV-97-0759-PHX-SMM. In addition, sixteen other similarly-situated capital defendants filed initial habeas applications in this District seeking the same relief. All of the cases were consolidated with *Hedlund v. Stewart*, No. CV-97-755-PHX-SMM (consolidated). In *Hedlund*, this Court found that there was a dearth of available post-conviction-relief (PCR) counsel as a result of Arizona's attempts to opt in to Chapter 154 procedures,[3] that the federal habeas statute of limitations

---

[3]        Chapter 154 of the Antiterrorism and Effective Death Penalty Act (AEDPA) provides procedural benefits in federal habeas cases filed by capital defendants to States that have 'opted in' to its requirements. *See Spears v. Stewart*, 283 F.3d 992, 1008 (9th Cir.

was not running for any of the petitioners, and that appointment of federal habeas counsel was premature; the Court dismissed each application without prejudice for failure to exhaust state court remedies. *See id.*, slip op. at 4-5, 7-8 (D. Ariz. March 5, 1998).

In July 1998, the Arizona Supreme Court issued the mandate in Petitioner's case and appointed PCR counsel for Petitioner. (ROA-PCR 144-146.)[4] Following appointment, counsel filed a PCR petition. (*Id.* 157.) The trial court denied relief without holding an evidentiary hearing, and the Arizona Supreme Court denied a discretionary petition for review. (ROA 161.) Petitioner then commenced these habeas proceedings.

Thereafter, Respondents moved this Court to apply Chapter 154's expedited habeas procedures to this case. (Dkt. 13.) Following briefing, the Court ruled that Arizona had not met the statutory opt-in requirements established by 28 U.S.C. § 2261. (Dkt. 43.) Because this was an exceptional issue of first impression in the District, the Court certified an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The Ninth Circuit concluded that Arizona's statutory mechanism for the appointment and payment of post-conviction counsel satisfied Chapter 154's substantive requirements. *See Spears v. Stewart*, 283 F.3d 992, 1007 (9th Cir. 2002). However, because there was a twenty-month delay before such counsel was appointed, the court ruled that Arizona could not take advantage of Chapter 154's expedited procedures in this case. *Id.* at 1018-19. Having answered the appellate issue, the Ninth Circuit remanded to this Court for further proceedings. *Id.* at 1019.

2002). In order to receive Chapter 154's expedited habeas procedures, a State must establish a post-conviction system which meets certain standards regarding appointment, payment and qualifications of post-conviction counsel. *Id.* at 1009 (citing 28 U.S.C. §§ 2263, 2266).

[4] "ROA" refers to the three-volume record on appeal from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-93-0139-AP). "RT" refers to the reporter's transcripts of Petitioner's trial and sentencing proceedings. "ME" refers to the minute entries of the trial court. "ROA-PCR" refers to the nine-volume record on appeal from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-99-0484-PC). A certified copy of the state court record was provided to this Court by the Arizona Supreme Court on November 20, 2000. (*See* Dkt. 14.)

Following remand, Petitioner prepared and submitted an amended habeas petition. (Dkt. 79.) The parties briefed the procedural status and merits of the claims presented, and Petitioner moved for discovery, evidentiary hearing, and an expansion of the record. (Dkts. 89, 94, 102-03, 105.) The Court denied Petitioner's motions and dismissed Claims 1, 4, 11, 16, 17 (in part), and 18-20. (Dkt. 120.) The Court now addresses the procedural status and/or merits of Petitioner's remaining claims.

## PRINCIPLES OF EXHAUSTION AND PROCEDURAL DEFAULT

A writ of habeas corpus may not be granted unless it appears that a petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991). To exhaust state remedies, a petitioner must "fairly present" the operative facts and the federal legal theory of his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). If a habeas claim includes new factual allegations not presented to the state court, it may be considered unexhausted if the new facts "fundamentally alter" the legal claim presented and considered in state court. *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986).

Exhaustion requires that a petitioner clearly alert the state court that he is alleging a specific federal constitutional violation. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004); *see also Gray v. Netherland*, 518 U.S. 152, 163 (1996) (general appeal to due process not sufficient to present substance of federal claim); *Lyons v. Crawford*, 232 F.3d 666, 669-70 (2000), *as amended by* 247 F.3d 904 (9th Cir. 2001) (general reference to insufficiency of evidence, right to be tried by impartial jury, and ineffective assistance of counsel lacked specificity and explicitness required); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) ("The mere similarity between a claim of state and federal error is insufficient to establish exhaustion."). A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or case law, *Lyons*, 232 F.3d at 670, or by citing state cases that plainly analyze the federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. The procedural bar relied on by the state court must be independent of federal law and adequate to warrant preclusion of federal review. *See Harris v. Reed*, 489 U.S. 255, 262 (1989). A state ruling of procedural default is not independent if, for example, it depends upon a federal constitutional ruling. *See Stewart v. Smith*, 536 U.S. 856, 860 (2002) (per curiam). A state procedural bar is not adequate unless it was firmly established and regularly followed at the time of the purported default. *See Ford v. Georgia*, 498 U.S. 411, 423-24 (1991).

Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray*, 518 U.S. at 161-62.

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*,

468 U.S. 1, 9 (1984).  As a general matter, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court.  *Coleman*, 501 U.S. at 750.

## AEDPA STANDARD FOR RELIEF

Petitioner filed his petition after the effective date of the AEDPA.  The AEDPA established a "substantially higher threshold for habeas relief" with the "acknowledged purpose of 'reducing delays in the execution of state and federal criminal sentences.'" *Schriro v. Landrigan*, 550 U.S. 465, 127 S. Ct. 1933, 1939-40 (2007) (quoting *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential standard for evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy,* 521 U.S. 320, 333 n.7 (1997)).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule

of law that was clearly established at the time his state-court conviction became final."
*Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 549 U.S. at 77; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and whether a state court applied that law unreasonably. *Clark*, 331 F.3d at 1069.

The Supreme Court has provided guidance in applying each prong of § 2254(d)(1). The Court has explained that a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Supreme Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam). In characterizing the claims subject to analysis under the "contrary to" prong, the Court has observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407. For a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable." *Id.* at 409; *see Landrigan*, 127 S. Ct. at 1939; *Visciotti*, 537 U.S. at 25.

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*). A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Landrigan*, 127 S. Ct. at 1939-40; *Miller-El II*, 545 U.S. at 240. However, it is only the state court's factual findings, not its ultimate decision, that are subject to 2254(e)(1)'s presumption of correctness. *Miller-El I,* 537 U.S. at 341-42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

As the Ninth Circuit has noted, application of the foregoing standards presents difficulties when the state court decided the merits of a claim without providing its rationale. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). In those circumstances, a federal court independently reviews the record to assess whether the state court decision was objectively unreasonable under controlling federal law. *Himes*, 336 F.3d at 853; *Pirtle*, 313 F.3d at 1167. Although the record is reviewed independently, a federal court nevertheless defers to the state court's ultimate decision. *Pirtle*, 313 F.3d at 1167

(citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.  Only when a state court did not decide the merits of a properly raised claim will the claim be reviewed *de novo*, because in that circumstance "there is no state court decision on [the] issue to which to accord deference." *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012, 1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

## **DISCUSSION**

### **Claim 2**

Petitioner contends that the trial court violated his constitutional rights by failing to suppress certain physical evidence obtained from his residence because the warrant authorizing the search was not supported by probable cause.[5]  (Dkt. 79 at 35-38.) Respondents concede that the claim was fairly presented under the Fourth and Fourteenth Amendments, but contest exhaustion regarding the Sixth Amendment.  (Dkt. 89 at 13.) Petitioner did not fairly present the Sixth Amendment aspect on direct appeal.  However, the Court concludes that the Sixth Amendment aspect of Claim 2 is technically exhausted but procedurally defaulted because it does not allege facts or law which would exempt it from preclusion and untimeliness pursuant to Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure were Petitioner to return to state court now.  *See* Ariz. R. Crim. P. 32.2(b), 32.1(d)-(h); *Coleman*, 501 U.S. at 732, 735 n.1.  Because Petitioner does not allege cause and prejudice or miscarriage of justice, the Sixth Amendment aspect of Claim 2 is

---

[5]     Petitioner also asserts that the trial court's failure to suppress the physical evidence violated his due process rights under the Fifth Amendment. (Dkt. 79 at 35.)  It is the Fourteenth Amendment, not the Fifth Amendment, that protects a person against deprivations of due process by a state. *See* U.S. Const. amend. XIV, § 1 ("nor shall any state deprive any person of life, liberty, or property without due process of law"); *Castillo v. McFadden*, 399 F.3d 993, 1002 n.5 (9th Cir. 2005) ("The Fifth Amendment prohibits the federal government from depriving persons of due process, while the Fourteenth Amendment explicitly prohibits deprivations without due process by the several States."). Because the Fifth Amendment Due Process Clause does not provide a cognizable ground for relief regarding Petitioner's state court conviction, allegations that the Fifth Amendment Due Process Clause was violated are dismissed and will not be further discussed with respect to Petitioner's individual claims.

procedurally barred.  (*See* Dkt. 94 at 29.)

Discussion

A claim invoking Fourth Amendment rights does not provide a basis for granting federal habeas relief from a state conviction if the petitioner had the opportunity to fully and fairly litigate the claim in state court.  *See Stone v. Powell,* 428 U.S. 465, 494 (1976); *see also Woolery v. Arave,* 8 F.3d 1325, 1326-27 (9th Cir.1993) (concluding that, unless the habeas petitioner was denied a full and fair opportunity to litigate his Fourth Amendment claim, *Stone* requires dismissal of the claim).  The relevant inquiry is whether the petitioner was afforded a full and fair hearing in the state court, not whether the state court reached a correct decision regarding the claim.  *See Ortiz-Sandoval v. Gomez,* 81 F.3d 891, 899 (9th Cir.1996); *Siripongs v. Calderon,* 35 F.3d 1308, 1321 (9th Cir.1994) (noting that *Stone v. Powell* makes irrelevant a habeas petitioner's argument that his Fourth Amendment claim was not correctly decided).

Prior to trial, Petitioner filed a motion to suppress the physical evidence obtained from the search of his residence.  (ROA 11.)  At an evidentiary hearing on the motion, Petitioner cross-examined each of the State's witnesses.  (RT 7/24/92; RT 8/7/92.)  The trial court ultimately concluded that there was sufficient evidence of probable cause for the search of Petitioner's residence.  (ME 8, 8/7/92.)  Following his conviction and sentence, Petitioner raised Claim 2 on direct appeal.  (*See* Appellant's Opening Br. at  16-27.)  The Arizona Supreme Court affirmed the trial court's findings.  *See Spears*, 184 Ariz. at 285, 908 P.2d at 1070.

The state court record demonstrates that Petitioner had a full and fair opportunity to litigate Claim 2 during pre-trial proceedings and on direct appeal.  *See Spears*, 184 Ariz. at 285, 908 P.2d at 1070.  Therefore, pursuant to *Stone v. Powell*, Claim 2 does not provide a basis for habeas relief.

Petitioner attempts to avoid this outcome by arguing that *Stone* is not applicable to capital cases. (Dkt. 94 at 29.)  He offers no support for this novel assertion, from the U.S. Supreme Court or otherwise, and the Court rejects it summarily.  *See Plumlee v. Masto*, 512

F.3d 1204, 1211 (9th Cir. 2008) (en banc) (applying the AEDPA and denying habeas relief in the absence of controlling Supreme Court precedent).  Moreover, the Ninth Circuit has applied *Stone* in capital cases.  *See, e.g.*, *Moormann v. Schriro*, 426 F.3d 1044, 1053 (9th Cir. 2005).  Because Petitioner had a full and fair opportunity to litigate Claim 2 in state court, it is dismissed as not cognizable.

**Claim 3**

Petitioner contends that statements he made to police officials were both involuntary and taken in violation of *Miranda*.  Petitioner argues that he is entitled to relief based upon the Fifth, Sixth, and Fourteenth Amendments.  Petitioner argued the Fifth and Fourteenth Amendment aspects on direct appeal, and they are properly exhausted.  (*See* Appellant's Opening Br. at 27-36; *Spears*, 184 Ariz. at 285-86, 908 P.2d at 1070-71.)   Although Petitioner mentioned the Sixth Amendment, he neither presented any operative facts nor any legal argument in support of this aspect of the claim (Appellant's Opening Br. at 35), and it was not addressed by the Arizona Supreme Court*, Spears*, 184 Ariz. at 285-86, 908 P.2d at 1070-71.  Mere citation does not constitute exhaustion.  *See Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (stating that Petitioner must describe both the operative facts and the federal legal theory so that the state courts have a fair opportunity to apply controlling legal principles to the facts); *Castillo v. McFadden*, 370 F.3d 882, 890 (9th Cir. 2004) ("Exhaustion demands more than drive-by citation, detached from any articulation of an underlying federal legal theory.").

The Court concludes that the Sixth Amendment aspect of Claim 3 is technically exhausted but procedurally defaulted because it does not allege facts or law which would exempt it from preclusion and untimeliness pursuant to Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure were Petitioner to return to state court now.  *See* Ariz. R. Crim. P. 32.2(b), 32.1(d)-(h); *Coleman*, 501 U.S. at 732, 735 n.1.  Because Petitioner does not allege cause and prejudice or miscarriage of justice, the Sixth Amendment aspect of Claim 3 is procedurally barred.

///

1    Background

2        The trial court conducted a hearing regarding Petitioner's voluntariness and *Miranda*

3    contentions.  (ROA 17; RT 7/24/92; RT 11/23/92; RT 11/24/92.)  At the hearing, Rudy

4    Zamora, a San Diego County homicide detective, testified that the Mesa Police Department

5    contacted him about Petitioner, who was an investigative lead in a homicide case and who

6    was allegedly driving the victim's stolen truck.  (RT 7/24/92 at 17-20.)  Arizona officials

7    advised that they would be filing a stolen vehicle report on behalf of the victim.  (*Id.* at 20.)

8    After locating Petitioner's San Diego address and ordering surveillance on his apartment

9    complex, Zamora proceeded to the address.  (*Id.* at 20-22.)  At approximately noon,

10   Petitioner and his girlfriend, JoAnn Rebecca Forrester, drove into the complex in the victim's

11   vehicle.  (*Id.* at 22.)  After verifying the vehicle's status as stolen thru NCIC, a national

12   stolen vehicle registry, Zamora arrested both Petitioner and Forrester.  (*Id.* at 22-28.) Zamora

13   testified that he did not advise either of them of their *Miranda* rights because he had no

14   intention of questioning them.  (*Id.*; RT 11/23/92 at 121.)  Both Petitioner and Forrester were

15   removed to a local sheriff's station.  (RT 7/24/92 at 24-32.)

16       At the station, Petitioner was handcuffed to a bench to await processing into the jail.

17   (RT 11/23/92 at 129-30.)  After processing, he was placed in a six-foot wide holding cell,

18   with a narrow wooden bench running along its width.  (*Id.* at 133-34.)  Petitioner was in the

19   holding cell for many hours into the night before his interview commenced.   At the

20   voluntariness hearing, Petitioner testified that his cell was too cold and the bench not wide

21   enough for him to sleep comfortably; he also testified that they did not provide him with any

22   food while in the holding cell.  (*Id.* at 320-21.)

23       Zamora testified that the holding cell was only twenty to thirty feet away from his desk

24   at the station and that the holding cell is part of the sheriff's office, receiving both air

25   conditioning and heat depending upon weather conditions.  (RT 11/23/92 at 132-134.)

26   Zamora contended that he checked on Petitioner to see if he needed anything or if he wanted

27   to use the restroom and that another officer provided Petitioner with food.  (*Id.* at 135.)

28       The trial court ruled that Petitioner's statements to police were not involuntary as a

result of jail conditions. (RT 11/24/92 at 336-38.) The court specifically found the police officers credible on the issue of providing a restroom break to Petitioner. (*Id.*) The court did not find the temperature in the holding cell or any alleged lack of food unduly coercive. (*Id.*)

While Petitioner was in the holding cell, Mesa and San Diego police officers requested, obtained, and executed a search warrant for Petitioner's apartment. (RT 7/24/92 at 34-39.) After the search, Arizona homicide investigators started the interview with Petitioner at 4:00 a.m. (*See* RT 11/24/92 at 319-20; ROA 17 attach. at 1-79.) Investigators advised Petitioner of his *Miranda* rights; he acknowledged and waived those rights and agreed to speak with investigators. (ROA 17 attach. at 3.) The investigators did not focus their questioning on the homicide; rather, they focused their questions on the stolen vehicle report and Petitioner's contention that he had title to the vehicle.

| | |
|---|---|
| [Police]: | What if we talk to her [the victim] and she says, "Hey he was in my house. He must have took the title and forged it." |
| [Petitioner]: | Well then it's her word against mine. |
| [Police]: | I'm just playing devil's advocate. You know? |
| [Petitioner]: | It's just her word against mine then. You want to arrest me for stealing a car, then let me call a lawyer and I'll have a lawyer appointed to me and, because this is going no where. I didn't steal her car. I have a title in my possession some where in my house, and this is just ridiculous. |
| [Police]: | No, we're not, all we're trying to do is when we got called from . . . . |
| [Petitioner]: | Well, I mean, how many times can I tell you, you know. I bought the car from her and I drove it here, and then I get arrested. |
| [Police]: | Did she seem like she was in a hurry to go somewhere? |
| [Petitioner]: | She seemed upset about something. I don't know what it was. You know, like I said, I didn't pry into her business. . . . |

(*Id.* at 21.) Eventually, the investigators told Petitioner they knew the victim was dead; Petitioner then demanded a lawyer and the interview was terminated shortly thereafter. (*Id.* at 79.)

The trial court determined that Petitioner had understood and properly waived his *Miranda* rights. (RT 11/24/92 at 336-38.) The court concluded that Petitioner's reference

to counsel in the exchange set forth above was ambiguous and that Petitioner did not effectively invoke his right to counsel. (*Id.*) However, with regard to the second request for counsel, made after learning that the police knew the victim was dead, the court concluded that Petitioner's request was clear and unambiguous. (*Id.*) Accordingly, the court suppressed Petitioner's statements following that invocation of counsel, and at trial the prosecution played a redacted tape of the police interview.[6] (*See* Dkt. 133.)

On direct appeal, the supreme court rejected Petitioner's voluntariness and *Miranda* claims. With regard to voluntariness, the court noted the following facts:

> When defendant arrived at the sheriff's station around noon on January 25, he was handcuffed to a bench for about an hour. He was then placed in a holding cell until 3:55 a.m. the next morning when the Mesa police interviewed him. . . .
>
> . . . At the voluntariness hearing, police officers testified that defendant was given the opportunity to use the bathroom and could have lain down on the bench in his holding cell. Furthermore, in the course of his interview with police, defendant did not ask officers to have something to eat or to use the bathroom.

*Spears*, 184 Ariz. at 285-86, 908 P.2d at 1070-71. Based on these facts, the court found Petitioner's statements voluntary because the conditions complained of "were merely uncomfortable and were not sufficient to overcome his free will." *Id.* at 286, 908 P.2d at 1071.

Regarding Petitioner's *Miranda* claim, the supreme court agreed with the trial court that Petitioner's first reference to counsel did not constitute an unambiguous request and thus the police were not required to stop questioning. *Spears*, 184 Ariz. at 285, 908 P.2d at 1070 (citing *Davis v. United States*, 512 U.S. 452 (1994)). The court further concluded that Petitioner's second request for counsel was unambiguous and that police questioning should have immediately stopped; however, it noted that none of Petitioner's statements following

---

[6]     From the tape played for the jury, the trial court ordered redacted the statements that followed Petitioner's second request for counsel. The judge further ordered redacted those parts of the victim's diary that had been read to Petitioner during the interrogation and which the court had determined must also be suppressed. (*See* RT 11/24/92 at 344-51; 11/30/92 at 476-80; ME 15, 11/30/92; *see also* Dkt. 133.)

this invocation were introduced at trial. *Id.*

Discussion

*Voluntariness*

Petitioner contends that his statements were involuntary due to the unreasonable conditions he had to endure at the jail prior to questioning. (Dkt. 79 at 38-43.) To ensure the voluntariness of a statement, the court must consider the effect that the totality of the circumstances had upon the will of the defendant. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973). Utilizing the totality of the circumstances test, both the characteristics of the accused and the details of the interrogation are considered. *See Dickerson v. United States*, 530 U.S. 428, 434 (2000); *see also Haynes v. Washington*, 373 U.S. 503, 513-14 (1963). Factors related to the accused include youth, lack of education, low intelligence, and lack of advice regarding constitutional rights. *See Schneckloth*, 412 U.S. at 426. Factors related to the interrogation include length of detention, the location of the interrogation, the repeated or prolonged nature of the questioning, and the use of physical punishment, including deprivation of food or sleep. *Id.*; *see also Withrow v. Williams*, 507 U.S. 680, 693-94 (1993).

Here, Petitioner was not a youth when questioned; he was thirty-three years old. While in the holding cell, due to his height, Petitioner could not comfortably stretch out and sleep. (RT 11/24/92 at 319-21.) Petitioner was not questioned until 4:00 a.m.; however, questioning included advice regarding his constitutional rights. Everything else about his interrogation was unremarkable regarding voluntariness. Based on this record, Petitioner's free will was not overcome by his uncomfortable surroundings prior to questioning. *See Spears*, 184 Ariz. at 286, 908 P.2d at 1071.

In a factually similar situation, the Ninth Circuit concluded that indicia of coercion were wholly absent where the suspect was interrogated after being detained for eight hours in a windowless holding cell, without water or restroom facilities. *See Clark*, 331 F.3d at 1073. Moreover, the Ninth Circuit has found voluntariness under conditions worse than those alleged by Petitioner. *See, e.g., Cunningham v. City of Wenatchee*, 345 F.3d 802, 810-11

1   (9th Cir. 2003) (suspect's statement voluntary even though interrogation lasted eight hours,

2   suspect was denied request to call therapist despite having mental disorder and requiring

3   bi-polar medication, and interrogator suggested that cooperation could lead to treatment

4   rather than prison).

5       Petitioner cites *Payne v. Arkansas*, 356 U.S. 560 (1958), and *Fikes v. Alabama*, 352

6   U.S. 191 (1957), in support.  In *Payne,* the involuntary confession involved a mentally-

7   challenged 19-year-old African American held incommunicado for three days with little food

8   and a police officer's threat to expose him to mob violence if he did not confess.  In *Fikes*,

9   the involuntary confession involved a mentally-challenged defendant who was possibly

10  schizophrenic, isolated for a week without access to his father or attorney, and questioned

11  daily for several hours at a time, and whose confession did not occur until the fifth day of

12  incarceration.  These cases are clearly distinguishable and do not support the conclusion that

13  Petitioner's statements were coerced due to uncomfortable jail conditions prior to

14  questioning.  The Arizona Supreme Court's decision finding Petitioner's statements

15  voluntary was not based on an unreasonable determination of the facts or application of

16  controlling federal law.

17      *Right to Counsel*

18      In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that any prisoner

19  in custodial interrogation must be informed, prior to questioning, of his right to an attorney

20  and to have an attorney present during questioning.  In addition, "[o]nce warnings have been

21  given, the subsequent procedure is clear. . . . If the individual states that he wants an attorney,

22  the interrogation must cease until an attorney is present."  *Miranda*, 384 U.S. at 473-74.  In

23  *Edwards v. Arizona*, 451 U.S. 477, 483-84 (1981), the Court confirmed that "after being

24  advised of his *Miranda* rights, the accused may himself validly waive his right and respond

25  to interrogation" so long as the waiver is voluntary, knowing, and intelligent.  Thus, a suspect

26  who knowingly and voluntarily waives their right to counsel after having that right explained

27  to them has indicated their willingness to deal with the police unassisted.  *See Davis*, 512

28  U.S. at 460-61.

To invoke the right to counsel during an interrogation after being advised of and validly waiving *Miranda* rights, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459; *see also Clark*, 331 F.3d at 1070 (stating that whether an accused actually invoked his right to counsel is an objective inquiry). However, if the reference to an attorney is ambiguous or equivocal such that an officer only understands that the suspect might be invoking the right to counsel, Supreme Court precedent does not require the cessation of questioning. *Davis*, 512 U.S. at 459. If the request is ambiguous, the *Davis* Court suggested that it would be good police practice to clarify whether or not the suspect wants an attorney, but the Court declined to adopt a rule requiring officers to ask clarifying questions. *Id.* at 461.

At the beginning of the Petitioner's interrogation, the officers read his *Miranda* rights and engaged him in a colloquy to ensure that he understood those rights. (ROA 17 at 2-3.) Petitioner indicated to the officers that he understood his rights and agreed to respond to their questions. (*Id.* at 3.) Thus, Petitioner indicated his willingness to deal with the police unassisted. *See Davis*, 512 U.S. at 460-61.

Petitioner contends that his first request for counsel was unambiguous and that questioning should have ceased. (Dkt. 79 at 40.) However, Petitioner conceded in his opening brief on direct appeal that his first request for counsel was ambiguous. (*See* Appellant's Opening Br. at 35 ("Admittedly, Mr. Spears' first request for an attorney did not constitute an unequivocal request for counsel.").) The doctrine of judicial estoppel prevents Petitioner from changing his position during these judicial proceedings. *See Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990).

Moreover, even if this Court declined to invoke judicial estoppel against Petitioner, which is discretionary, the Court alternatively concludes and agrees with the Arizona Supreme Court that Petitioner's first reference to counsel was not an unequivocal request that counsel be appointed. Petitioner stated: "You want to arrest me for stealing a car, then let me call a lawyer and I'll have a lawyer appointed to me and, because this is going no where.

I didn't steal her car." (ROA 17 attach. at 21.) Petitioner plainly used conditional and uncertain language in addressing the officers, and such language did not invoke counsel in an unambiguous manner. When the police responded by changing course and pursuing a different line of questions, Petitioner responded to those questions; he did not indicate that he was requesting counsel. (*Id.*) Petitioner knew how to invoke counsel; he chose not to do so.

Under *Davis*, the officers were not required to ask clarifying questions. 512 U.S. at 461. The conclusion that Petitioner's request did not invoke counsel is supported by *Davis* and *Clark*. In *Davis*, the Supreme Court concluded that "maybe I should talk to a lawyer" was ambiguous and did not invoke counsel. *Id.* In *Clark*, the Ninth Circuit similarly concluded that "I think I would like to talk to a lawyer" was ambiguous and did not invoke counsel. *Clark*, 331 F.3d at 1071. Thus, the Arizona Supreme Court's conclusion that Petitioner's first reference to counsel did not unequivocally invoke his right to counsel was not based on an unreasonable determination of the facts or application of controlling federal law.

Petitioner also contends that the prosecution violated *Miranda* by introducing statements after his second reference to counsel. (Dkt. 79 at 43.) However, the Arizona Supreme Court concluded that the prosecution did not introduce any statements that followed this unequivocal invocation of Petitioner's right to counsel. *See Spears*, 184 Ariz. at 286, 908 P.2d at 1071. The redacted tape played to the jury supports this finding; after Petitioner invoked counsel, no further statement by Petitioner was submitted to the jury. (*See* Dkt. 133.) The Arizona Supreme Court's conclusion that no improper statements were admitted after Petitioner invoked counsel was not contrary to or an unreasonable application of clearly established federal law. Petitioner is not entitled to relief on Claim 3.

**Claims 5 and 15-B**

In Claim 5, Petitioner alleges that he was denied his right to present a complete defense at trial because the prosecution failed to disclose the felony conviction of one of its witnesses, Michael Smith. (Dkt. 79 at 50-52.) In Claim 15-B, Petitioner contends that

counsel rendered ineffective assistance at trial by not fully investigating Smith's prior felony conviction and subsequent arrest for embezzlement from the Krueger Company, where both Smith and the victim worked. (Dkt. 79 at 85-87.) Respondents concede that Petitioner properly exhausted these claims. (Dkt. 89 at 21, 37.) They contend that Smith only provided factual information about the victim's personnel matters at the company and, therefore, impeaching Smith's testimony at trial would not have affected the verdict. (Dkt. 89 at 21-22.) Respondents further argue that Petitioner's allegations of ineffective assistance do not establish *Strickland* prejudice. (*Id.* at 41-42.)

Background

At trial, prosecution witness Michael Smith testified that he worked for the Krueger Company as its controller and personnel director. (RT 11/30/92 at 482.) Smith testified about various personnel matters regarding the victim, including her job description, wages, and work schedule. (*Id.* at 482-87.) Smith testified that during the company shut-down over the December holidays, the victim called the company to request a leave of absence due to a family emergency. (*Id.*)

After Petitioner's conviction, but prior to sentencing, Petitioner learned that Smith had a prior felony conviction that was not disclosed by the prosecution. (RT 3/5/93 at 3-8.) The trial court ordered additional briefing on this issue. (RT 3/12/93 at 13.) The state conceded it was unaware of Smith's prior felony conviction and therefore did not disclose it. (ROA 60.) Nonetheless, it argued that nondisclosure of Smith's prior felony conviction was not material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), because Smith only testified about Petitioner's employment information at the Krueger Company. (*Id.*) Therefore, impeachment of Smith would not have undermined confidence in the verdict. (*Id.*) Petitioner advised the court that Smith had been convicted of felony embezzlement and felony misapplication by a bank employee and had been incarcerated for two years in California. (ROA 61.) Petitioner argued that if Smith's conviction had been properly disclosed, he could have investigated Smith for possible information inculpating Smith in the victim's death. (*Id.*)

The trial court concluded that, even if defense counsel had impeached Smith at trial with his prior felony conviction, it would not have affected the verdict because of the limited factual nature of Smith's testimony. (ME 30.) On appeal, the Arizona Supreme Court agreed:

> Smith was the personnel director at Jeanette's place of employment, and he testified that: (1) Jeanette was not at work on January 6, 1992; (2) he later learned that she had called to request a leave of absence for a family problem; (3) Jeanette's mother had called her place of work around mid-January looking for her daughter; and (4) Smith had called the police after a co-worker had seen a news bulletin about an unidentified body and had recognized some of Jeanette's personal belongings. Smith's prior felony convictions could only have been used for impeachment purposes under rule 609(a), Arizona Rules of Evidence, and it is likely that other employees could have verified Smith's factual testimony. Defendant could not have used the convictions or subsequent arrest to show that Smith committed the murder because none of that evidence had an inherent tendency to connect Smith to Jeanette's death. *See State v. Fulminante*, 161 Ariz. 237, 252, 778 P.2d 602, 617 (1988), aff'd, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) ("Before a defendant may introduce evidence that another person may have committed the crime, the defendant must show that the evidence has an inherent tendency to connect such other person with the actual commission of the crime."). Under these circumstances, we agree with the trial court that a new trial was not warranted because disclosure of Smith's prior conviction would not have changed the jury verdict.

*Spears*, 184 Ariz. at 287-88, 908 P.2d at 1072-73.

During state post-conviction proceedings, Petitioner gathered evidence regarding Smith's embezzlement activities and his cooperation with governmental authorities as part of their criminal investigation. (ROA-PCR 157 at 22-26.) Petitioner contended that trial counsel rendered ineffective assistance at trial because they did not investigate Smith more fully to determine if any there was any evidence that Smith may have committed the murder. (ROA-PCR 157 at 22-26.) The trial court determined that Petitioner's mere allegations did not establish *Strickland* prejudice. (ROA-PCR 161 at 11-12.)

Discussion

*Claim 5*

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), a successful *Brady* claim requires three findings: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the issue of guilt or punishment. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the

defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Harris v. Vasquez*, 949 F.2d 1497, 1528 (9th Cir. 1990). The prosecutor's duty to disclose material evidence includes impeachment as well as exculpatory evidence. *Bagley*, 473 U.S. at 676. In *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995), the Supreme Court further elaborated upon materiality regarding impeachment evidence, concluding that nondisclosed impeachment evidence must be evaluated piece by piece and cumulatively in the context of the whole case. *Id.* at 436 n.10.

The Court assesses whether, if the prosecutor had disclosed Smith's felony conviction, it would have placed the case in such a different light so as to undermine confidence in the jury verdict. *See, e.g., Kopycinski v. Scott* 64 F.3d 223, 226 (5th Cir. 1995) (discussing the nondisclosed felony conviction of a key prosecution witness and concluding that it was not material because the evidence at trial corroborated his testimony); *see also State v. Borbon*, 146 Ariz. 392, 706 P.2d 718 (1985). At trial, Smith was only a fact witness, testifying to personnel matters at the victim's workplace. *See Spears*, 184 Ariz. at 287-88, 908 P.2d at 1072-73. Smith was not an important or key witness for the prosecution. *Id.* Thus, impeachment of his testimony would have had little effect on the verdict. The state court's determination that the failure to disclose Smith's conviction was immaterial under *Brady* was not based on an unreasonable determination of the facts or application of controlling federal law. Petitioner is not entitled to relief on Claim 5.

*Claim 15-B*

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Id.* at 687. The performance inquiry asks whether counsel's assistance was reasonable considering all of the circumstances. *Id.* at 688-89. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption

- 22 -

that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

A petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The assessment of prejudice should proceed on the assumption that the decision-maker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id.* at 695. If the state's case is weak, there is a greater likelihood of a reasonable probability that the outcome of the trial would have been different. *See Johnson v. Baldwin*, 114 F.3d 835, 839-40 (9th Cir. 1997). A court need not address both components of the inquiry, or follow any particular order in assessing deficiency and prejudice. *Strickland*, 466 U.S. at 697. If it is easier to dispose of an ineffectiveness claim on the ground of lack of prejudice, without evaluating counsel's performance, then that course should be taken. *Id.*

During Petitioner's PCR proceedings, Petitioner gathered evidence regarding Smith's embezzlement activities and his cooperation with governmental authorities in their criminal investigation. (ROA-PCR 157 at 22-26.) As a result of his investigation, Petitioner argued that trial counsel should have investigated Smith's activities because these activities, combined with certain entries in the victim's diary, could have led to information that someone else committed the murder. (*Id.*) He repeats these same allegations in his habeas petition. (Dkt. 79 at 85-87.)

The Ninth Circuit holds that speculative and conclusory allegations that are not supported by specific facts do not establish *Strickland* prejudice. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994). Petitioner's speculative allegation that additional investigation could have led to inculpatory evidence against someone else is insufficient to establish prejudice. Recognizing the conclusory nature of his allegations, Petitioner indicated in his habeas petition that evidence in support of *Strickland* prejudice would be outlined in his motion for evidentiary development. (Dkt. 94 at 49.) It was not. (*See* Dkt.102 at 7-74; Dkt. 105 at 23-

27.)  Therefore, the state court's determination that Petitioner failed to establish *Strickland* prejudice and consequently  ineffective assistance, was not contrary to or an unreasonable application of clearly established federal law.  Petitioner is not entitled to relief for Claim 15-B.

**Claim 6**

Petitioner alleges insufficient evidence existed to support his first degree murder conviction because the prosecution failed to establish the element of premeditation.  (Dkt. 79 at 53-55.)  Although Respondents contest exhaustion, Petitioner fairly presented the Fourteenth Amendment aspect of this claim on direct appeal.  (*See* Appellant's Opening Brief at 58-60.)  Petitioner cited *State v. Kreps*, 146 Ariz. 446, 449, 706 P.2d 1213, 1216 (1985), which analyzed the due process standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), to resolve whether sufficient evidence of premeditation existed for a first degree murder conviction.  *See Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc) (holding that citation of state authority that plainly analyzes the federal constitutional claim is sufficient for exhaustion).  Thus, the due process allegation in Claim 6 was properly exhausted.

Petitioner did not fairly present the Sixth Amendment aspect on direct appeal.[7]  However, the Court concludes that it is technically exhausted but procedurally defaulted

---

[7]  Petitioner also alleges that his right to be free of cruel and unusual punishment pursuant to the Eighth Amendment was violated.  The right to be free of cruel and unusual punishment, by definition, is a protection related to the imposition or carrying out of a sentence.  In other words, the protection afforded by the Eighth Amendment does not attach until a person is convicted and subject to punishment by the state.  *See Ingraham v. Wright*, 430 U.S. 651, 664, 667, 671 n.40 (1977) (summarizing that the Eighth Amendment circumscribes only the type of punishment imposable on those convicted, punishment grossly disproportionate to the crime and what can be criminalized and punished); *Bell v. Wolfish*, 441 U.S. 520, 536 n.16 (1979) (noting that the Eighth Amendment has no application to pretrial detainees).  Because the Eighth Amendment does not provide a cognizable ground for relief regarding conviction-related claims, this aspect of the claim is dismissed and will not be further discussed with respect to this and any other conviction-related claims in which it has been asserted.

because Petitioner does not allege facts or law which would exempt it from preclusion and untimeliness pursuant to Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure were Petitioner to return to state court now. *See* Ariz. R. Crim. P. 32.2(b), 32.1(d)-(h); *Coleman*, 501 U.S. at 732, 735 n.1. Because Petitioner does not allege cause and prejudice or miscarriage of justice, the Sixth Amendment aspect of Claim 6 is procedurally barred. (*See* Dkt. 94 at 36.)

Discussion

The Arizona Supreme Court found and concluded that there was sufficient evidence of premeditation to support Petitioner's first degree murder conviction:

> In determining whether there was sufficient evidence of premeditation, this court will not reweigh the evidence and will view it in the light most favorable to sustaining the conviction. *Kreps*, 146 Ariz. at 449, 706 P.2d at 1216. In this case, the evidence showed that: (1) defendant had Jeanette purchase a one-way plane ticket so that he could fly to Phoenix; (2) he left for Phoenix with a 9mm Beretta gun in his possession; (3) he told his California girlfriend that he was coming to Phoenix to work on some airplanes, but no evidence showed that he did any work while in Arizona; (4) Jeanette requested a leave of absence from work; (5) after defendant arrived in Phoenix, Jeanette got cash advances on her credit cards and prepared to sign her truck title over to defendant; and (6) Jeanette was shot in the back of the head, which is inconsistent with a heat-of-passion murder. Based on this evidence, a rational trier of fact could have believed that defendant deliberately planned to kill Jeanette before he committed the murder. Therefore, the trial court did not err in finding that the state had sufficiently proven premeditation.

*Spears*, 184 Ariz. at 289-290, 908 P.2d at 1074-75.

Petitioner contends that the state courts misconstrued the evidence about his travel to Phoenix on a one-way plane ticket because he had planned to purchase the victim's truck and drive the truck back to San Diego. (Dkt. 79 at 53-54.) Petitioner acknowledges that he took his 9mm handgun on the trip and that prior to her death the victim contacted her employer regarding taking a leave of absence. (*Id.* at 54.) Despite this and the other evidence at trial, he contends that the prosecution did not establish premeditation. (*Id.*)

On habeas review, the "rational factfinder" standard is used to determine whether there is sufficient evidence to support a state court's finding of the elements of the crime. *See Lewis v. Jeffers*, 497 U.S. 764, 781 (1990). The question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have

- 25 -

found the essential elements of the crime beyond a reasonable doubt." *See Jackson*, 443 U.S. at 319. A habeas court "faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution." *Id*. at 326; *see also Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) (per curiam). The *Jackson* standard is applied to the substantive elements of the criminal offense as defined by state law. *See Davis v. California*, 384 F.3d 628, 639 (9th Cir. 2004). Under the AEDPA, a conviction will not be overturned unless it is contrary to or an unreasonable application of clearly established federal law. *See Juan H. v. Allen*, 408 F.3d 1262, 1275 n.13 (9th Cir. 2005); *Bruce*, 376 F.3d at 960 (O'Scannlain, J., concurring).

Under Arizona law, premeditation requires that the "defendant acts with either the intention or knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion." A.R.S. § 13-1101(1) (West 1992).[8] To establish that Petitioner premeditated the murder, the state must prove that Petitioner made a decision to kill before committing the act. *See State v. Gulbrandson*, 184 Ariz. 46, 65, 906 P.2d 579, 598 (1995).

In this case, the Arizona Supreme Court carefully relied on six pieces of circumstantial evidence to conclude that Petitioner premeditated the murder. *Spears*, 184 Ariz. at 289-290, 908 P.2d at 1074-75. In Arizona, the standard for establishing premeditation is not high; the prosecution need only show that the defendant had time to reflect after forming the intent to kill. *See Cook v. Schriro*, 538 F.3d 1000, 1024 (9th Cir. 2008); *Summerlin v. Schriro*, 341 F.3d 1082, 1093 (9th Cir. 2003) (en banc), *overruled on other grounds*, 542 U.S. 348 (2004); *Clabourne v. Lewis*, 64 F.3d 1373, 1380-81 (9th Cir. 1995).

A rational trier of fact could conclude that the evidence presented at trial established

---

[8] The definition of premeditation was amended in 1998 to indicate that proof of actual reflection is not required. 1998 Ariz. Sess. Laws, ch. 389 § 6.

premeditation. First, the evidence supports a finding that Petitioner planned the murder. He brought his 9mm handgun to Arizona, and an expert testified that a spent 9mm shell casing from this handgun was found near the victim's body. Second, the evidence supports a finding that Petitioner influenced the victim to call into work and request a leave of absence so that interested friends would not notice her absence immediately. Third, the evidence supports a motive for the killing. Petitioner had possession of the victim's truck, guns, and other belongings. In addition, Petitioner, who was unemployed, possessed a significant amount of cash when he returned to California, and the victim had obtained multiple cash advances prior to her death. Finally, the manner of death of the victim – being shot in the back of the head – does not support a sudden quarrel or heat of passion theory of murder.

Petitioner's arguments that the state courts misconstrued the evidence is irrelevant. Conflicting inferences in regard to the evidence presented at trial are resolved in favor of the prosecution. *See Jackson*, 443 U.S. at 325. Based on the foregoing, the Arizona Supreme Court's conclusion that sufficient evidence of premeditation existed was not contrary to or an unreasonable application of clearly established federal law. Petitioner is not entitled to relief on Claim 6.

**Claim 7**

Petitioner argues that the Due Process Clause of the Fourteenth Amendment forbids upholding his conviction for theft of property worth more than $750 but less than $1500 because there was insufficient proof of the value of the victim's 1984 Dodge Rampage truck. (Dkt.79 at 55-56.) Respondents contend that this claim was not presented on direct appeal and is defaulted. (Dkt. 89 at 24-25.) Regardless of exhaustion, the Court will deny this claim because it is plainly meritless. *See* 28 U.S.C. § 2254(b)(2); *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

This Court reviews whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found that the jury's determination of value was established by sufficient evidence. *See Jackson*, 443 U.S. at 319; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) (stating that state courts are the ultimate expositors of state

law and that federal courts are bound by their constructions unless extreme circumstances are present).

In Arizona, the jury assigns value to the stolen property, and its value determination resolves the statutory penalty assigned to the theft conviction. *See State v. Jones*, 104 Ariz. 14, 15, 448 P.2d 70, 71 (1968); *State v. Brokaw*, 134 Ariz. 532, 535, 658 P.2d 185, 188 (App. 1982); A.R.S. § 13-1802(C), § 13-701). In theft cases, the proper inquiry is the property's fair market value at the time of the loss. *See State v. Ellis*, 172 Ariz. 549, 551, 838 P.2d 1310, 1312 (App. 1992). Specific testimony about value is unnecessary if value may be inferred from other evidence and the item is not something so unique as to require expert testimony as to value. *See State v. Blankinship*, 127 Ariz. 507, 511-12, 622 P.2d 66, 70-71 (1980).

The Arizona Supreme Court found that there was sufficient evidence from which the jury could conclude that the truck had a fair market value between $750 and $1,500, based on the following: (1) Petitioner told his girlfriend that he had bought the truck for $3,000; (2) a friend of the victim testified that the truck was in good condition; (3) the truck was operable as evidenced by Petitioner driving it at the time of his arrest; and (4) the truck's lack of uniqueness such that expert testimony on valuation was unnecessary. *Spears*, 184 Ariz. at 290, 908 P.2d at 1075.

Under the AEDPA, the state court's application of the *Jackson* standard will not be overturned unless it is objectively unreasonable. *See Juan H.*, 408 F.3d at 1275 n.13. Given the age, make, model, and working condition of the victim's eight-year-old truck – all of which was presented at trial – a rational trier of fact could have determined that it was worth between $750 and $1500. Therefore, the Arizona Supreme Court's conclusion that there was sufficient evidence of value was not contrary to or an unreasonable application of clearly established federal law. Petitioner is not entitled to relief on Claim 7.

**Claim 8**

Petitioner alleges that the jury engaged in misconduct during deliberations in violation of his Fifth, Sixth and Fourteenth Amendment rights. (Dkt. 79 at 56-59.) Specifically,

Petitioner argues that the jury improperly considered the fact that he did not testify at trial and that the jury inappropriately reviewed external material during deliberations– an alternate juror's notes taken during trial. (*Id.*) Respondents concede that these allegations were properly exhausted. (Dkt. 89 at 26.)

Background

Shortly after Petitioner's conviction, the jury foreperson, Janet Kovach,[9] sent a letter to the trial judge claiming that jurors disregarded the court's instructions by commenting about Petitioner's failure to testify, speculating that did not testify because he was guilty. (ROA 43c.) In his motion for new trial, Petitioner submitted an affidavit from Kovach, who also claimed that an alternate juror's notes found their way into the jury room during deliberations. (ROA 55.) Kovach did not, however, indicate any substantive content or personal knowledge regarding the notes.

The trial court ordered briefing on the issue of the alternate juror's notes. (RT 3/12/93 at 8-9.) In response, the prosecution submitted affidavits from: (1) a trial juror who stated that he did not see the alternate juror's notes in the jury room or hear that other jurors had reviewed them; (2) the courtroom deputy who assisted during the trial stated that she generally instructs excused alternate jurors to leave their notes in their chairs and that her regular practice is to collect and shred these notes; and (3) the alternate juror who stated that, after being dismissed from the panel, he left his notes on his chair as instructed and exited the courtroom. (ROA 60.) The alternate juror's affidavit, however, did not include or summarize any substantive content of the notes.

The trial court did not convene an evidentiary hearing, concluding that even if she assumed that the notes were in the jury room during deliberations, they were not extrinsic evidence and were not prejudicial. (RT 3/31/93 at 6-7.) Neither party disputes that the notes of the alternate juror were destroyed and are unavailable. (*See* Appellant's Opening Br. at

---

[9] Less than one year after Petitioner's conviction and sentence, Kovach married Petitioner. (Dkt. 79 at 57.) In his Amended Petition, Petitioner advised that his wife, Janet Spears, assisted PCR counsel in his defense during PCR proceedings. (*Id.*)

64.)

Discussion

Regarding allegations that the jury improperly discussed Petitioner's failure to testify at trial, the Arizona Supreme Court held:

> We agree with the trial court that the vague allegation in the foreperson's affidavit that the jury discussed defendant's failure to take the stand is not a sufficient basis for granting a new trial. *See United States v. Martinez-Moncivais*, 14 F.3d 1030, 1036-37 (5th Cir.), *cert. denied*, 513 U.S. 816, 115 S.Ct. 72, 130 L.Ed.2d 27 (1994) (holding that juror's post-trial affidavit alleging consideration of defendant's failure to testify is inadequate basis for new trial). In addition, further inquiry into this allegation may have required an improper inquiry into the mental processes of the jurors. *See State v. Covington*, 136 Ariz. 393, 396-97, 666 P.2d 493, 496-97 (1983); *State v. Callahan*, 119 Ariz. 217, 220, 580 P.2d 355, 358 (App.1978).

*Spears*, 184 Ariz. at 288, 908 P.2d at 1073. The Arizona Supreme Court is correct. It is a firmly established rule that juror testimony is inadmissible to impeach a jury verdict. *See Tanner v. United States*, 483 U.S. 107, 117 (1987). Strong policy considerations are at stake under this rule:

> [L]et it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation – to the destruction of all frankness and freedom of discussion and conference.

*Id*. at 119-20 (quoting *McDonald v. Pless*, 238 U.S. 264, 267-68 (1915)).

An exception to the rule occurs only in situations where an "extraneous influence" is alleged to have affected the jury's verdict. *Tanner*, 483 U.S. at 117. The Arizona Supreme Court concluded that juror discussion about Petitioner's decision not to testify was not an extraneous influence. *See Spears*, 184 Ariz. at 288-89, 908 P.2d at 1073-74. The Court agrees. *See Raley v. Ylst*, 470 F.3d 792, 803 (9th Cir. 2006) (stating that a defendant's failure to testify happens in the courtroom and is a part of the trial, not extrinsic to it). Thus, Petitioner's allegation is subject to the rule that disallows jury testimony to impeach a verdict. *See Tanner*, 483 U.S. at 117. The Arizona Supreme Court's decision was neither

contrary to nor an unreasonable application of controlling federal law.

Regarding alleged jury misconduct in reviewing the alternate juror's notes during deliberations, the Arizona Supreme Court discussed and resolved the issue, as follows:

> When a defendant alleges that jurors have considered facts not properly in evidence, "the trial court must grant a new trial if it cannot find beyond a reasonable doubt that the extrinsic evidence did not contribute to the verdict." *State v. Hansen*, 156 Ariz. 291, 295, 751 P.2d 951, 955 (1988). A preliminary issue is whether the alternate's notes constitute extrinsic evidence that was not introduced at trial. The trial court refused to hold an evidentiary hearing on this issue and instead assumed that the notes were not extraneous evidence because they were taken at trial and were based on evidence that had been properly admitted. It is not inconceivable, however, that the alternate juror could have written some extraneous material in his trial notes.
>
> Even if we assume that the notes were extraneous evidence, defendant is not entitled to a new trial because he has failed to show actual prejudice. *See State v. Miller*, 178 Ariz. 555, 560, 875 P.2d 788, 793 (1994). In *Miller*, an alternate juror, who had already been excused, left a note on a juror's car during deliberations expressing his belief that defendant was guilty. 178 Ariz. at 557, 875 P.2d at 790. We remanded that case for an evidentiary hearing. *Miller*, 178 Ariz. at 560, 875 P.2d at 793. In this case, the jury foreperson's affidavit stated only that the "jury obtained the notes of the alternate juror and reviewed and considered them during deliberations." This affidavit does not indicate that the notes contained extraneous information that was damaging or prejudicial. Furthermore, the state submitted an affidavit from another juror stating that he did not review, nor did he see any other juror reviewing, notes from an alternate juror. *See State v. Childs*, 113 Ariz. 318, 323-24, 553 P.2d 1192, 1197-98 (1976) (discounting affidavit from one juror impeaching verdict because nothing in record indicated that jurors were guilty of misconduct). Under these circumstances, we conclude that the trial court did not abuse its discretion by denying defendant an evidentiary hearing and a new trial. *See State v. Hooper*, 145 Ariz. 538, 548, 703 P.2d 482, 492 (1985) (finding no prejudice warranting new trial where two dismissed alternate jurors met with two remaining jurors before deliberations). We caution that in the future, however, trial judges should err on the side of granting an evidentiary hearing so that they can gather as much relevant information as possible before making their rulings.

*Spears*, 184 Ariz. at 288-89, 908 P.2d at 1073-74.

Due process requires that the defendant be tried by an impartial jury, capable and willing to decide the case solely on the evidence before it. *See Smith v. Phillips*, 455 U.S. 209, 217 (1982). The core principle is well-settled: evidence developed against a defendant must come from the witness stand. *Mattox v. United States*, 146 U.S. 140, 149-50 (1892). Although AEDPA restricts federal law to Supreme Court precedent, Ninth Circuit precedent may be persuasive authority for purposes of determining whether a particular state court decision is an unreasonable application of Supreme Court precedent. *See Sims v. Roland*,

414 F.3d 1148, 1151 (9th Cir. 2005).

When a jury considers extrinsic information that was not introduced at trial, it may deprive a defendant of his Sixth Amendment right to confrontation, cross-examination, and the assistance of counsel regarding such evidence. *See Parker v. Gladden*, 385 U.S. 363, 364-65 (1966); *Fields v. Brown*, 503 F.3d 755, 779 n.18 (9th Cir. 2007) (en banc). The Ninth Circuit considers five factors relevant to determine whether a Sixth Amendment deprivation occurred: (1) whether the extraneous evidence was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the extraneous information was discussed and considered by the jury; (4) whether the extraneous evidence was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matter which may bear on the issue of whether the introduction of extrinsic material substantially and injuriously affected the verdict. *Fields*, 503 F.3d at 779 n.18.

The Ninth Circuit considers other factors that might suggest that the potential prejudice of extrinsic information is diminished in a particular case: (1) whether the prejudicial statement was ambiguously phrased; (2) whether the extraneous information was otherwise admissible or merely cumulative of other evidence adduced at trial; (3) whether a curative instruction was given or some other step taken to ameliorate the prejudice; (4) the trial context; and (5) whether the statement was insufficiently prejudicial given the issues and evidence in the case. *See Jeffries v. Wood*, 114 F.3d 1484, 1491-92 (9th Cir. 1997) (en banc), *overruled on other grounds*, *Lindh v. Murphy*, 521 U.S. 320 (1997). The extent, if at all, to which the jurors saw or discussed extrinsic evidence is a question of historical fact to which the state court's findings are entitled to a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1); *Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007); *see also Burks v. Borg*, 27 F.3d 1424, 1432 (9th Cir. 1994).

On habeas review, Petitioner bears the burden of establishing that consideration of the extrinsic information had a substantial and injurious effect or influence on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Fields*, 503 F.3d at 781 n.20. The determination of prejudice resulting from the jury's consideration of extrinsic information

is an objective standard, not a subjective one. *See, e.g., Fields*, 503 F.3d at 781 (stating that a long line of authority makes clear that a court may not consider the subjective impact of improperly considered evidence upon jurors during deliberations–the question of prejudice is objective).

Based on the trial record, the Arizona Supreme Court proceeded on the assumption that the alternate's notes were in the jury room. *Spears*, 184 Ariz. at 289, 908 P.2d at 1074. Based on the lack of any substantive information in Kovach's affidavit, they did not determine what substantive information was in the notes; they only determined that the notes did not contain extraneous information that was damaging or prejudicial to Petitioner. (*Id.*)

Petitioner has not met his burden of establishing that the jury's consideration of the notes had a substantial and injurious effect or influence upon their verdict. *See Fields*, 503 F.3d at 781. The *Jeffries* factors are helpful to the Court in determining whether Petitioner established prejudice. The *Jeffries* factors all weigh against a showing of actual prejudice. First, there were no established prejudicial statements submitted to the jury in the notes; second, any extraneous information in the notes was cumulative to other evidence adduced at trial; third, there was no need for a curative instruction because the notes were not received until after the court given its jury instructions and deliberations had commenced; and finally, since no substantive extrinsic information was established, the notes themselves were not prejudicial. Thus, even assuming that the alternate notes were in the jury room, there is no reasonable likelihood that the notes affected the verdict because the notes did not contain any prejudicial information. *Cf. United States v. Olano*, 507 U.S. 725, 737 (1993) (stating that the presence of alternate jurors during jury deliberations is not the kind of error that affects substantial rights apart from a showing of prejudice). The Court concludes that Petitioner did not carry his burden under *Brecht*. The state supreme court's decision regarding the alternate juror's notes was not contrary to or an unreasonable application of controlling federal law.

Moreover, during habeas proceedings, Petitioner did not seek to factually develop the record regarding Claim 8. (*See* Dkts. 102, 105.) In his motion for discovery, an evidentiary

hearing and for an expansion of the state court record, Petitioner did not proffer any evidence of prejudice regarding Claim 8; he only speculated that there may be prejudice. (*See id.*; *see also* Dkt. 79 at 56-59.)  Petitioner's speculation is insufficient to establish prejudice.

However, in this Court's review of the habeas record for Claim 16–which was dismissed as a non-cognizable habeas claim (*see* Dkt. 120 at 12)–Petitioner requested that the record be expanded to include the 2003 Declaration of his wife, Janet Spears, the jury foreperson who first alleged that an alternate juror's notes found their way into the jury room. (Dkt. 79 at 103, Ex. CC.)  In an attachment to her declaration, Mrs. Spears indicated that the words "perfect match" were in the alternate juror's notes, referring to testimony by the prosecution's ballistics expert that the shell casing found at the scene of the murder was fired from Petitioner's 9mm handgun. (Dkt. 103, Ex. CC, Attach. H.)  Mrs. Spears further alleged that the testimony of the ballistics expert did not utilize the terms "perfect match." (*Id.*)

First, even though this evidence was available at the time of post-conviction proceedings, Petitioner neither raised Claim 8 nor presented this additional factual evidence in support during post-conviction proceedings. (*See* ROA-PCR 157.)  Therefore, Petitioner did not diligently develop the factual basis of Claim 8 during state court proceedings.  *See* 28 U.S.C. § 2254(e)(2); *Cooper-Smith v. Palmateer*, 397 F.3d 1236 (9th Cir. 2005) (stating that petitioner is not entitled to evidentiary development on habeas review when he failed to first present the new evidence in state post-conviction proceedings; § 2254(e)(2) bars him from introducing new evidence as an expansion of the record); *see also Holland v. Jackson*, 542 U.S. 649 (2004) (same). Second, as previously indicated, Petitioner also failed to seek evidentiary development for Claim 8 in this Court and is now procedurally barred from obtaining an evidentiary hearing or an expansion of the record for this evidence. (*See* Dkts. 102, 105; 28 U.S.C. § 2254(e)(2).)

Even if Petitioner had been diligent and entitled to consideration of this new evidence, an evaluation of the substantive information does not have a substantial and injurious effect or influence upon the verdict.  The substantive import of the notes is limited to a comment on the testimony of the prosecution's ballistics expert, who testified that the 9mm shell

casing obtained from the scene was fired by Petitioner's 9mm handgun. (*See* RT 12/3/92 at 829-56.) The comment, "perfect match" is merely cumulative to the testimony presented at trial, not new and prejudicial information. (*Id.*) Therefore, under the *Jeffries* factors, such evidence does not establish prejudicial error under the Sixth Amendment. *See Jeffries*, 114 F.3d at 1491-92. Petitioner is not entitled to relief for Claim 8.

**Claim 9**

Petitioner alleges there was insufficient evidence to support either his first degree murder conviction or his theft conviction. (Dkt. 79 at 59-63.) Although Respondents contest exhaustion, Petitioner presented the Fourteenth Amendment aspect of this claim on direct appeal. (*See* Appellant's Opening Brief at 65-67.) Petitioner cited *United States v. Barron-Rivera*, 922 F.2d 549, 552 (9th Cir. 1991), which analyzed the federal due process standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), to resolve whether there was sufficient evidence of each element of the crime beyond a reasonable doubt. Thus, the Fourteenth Amendment due process aspect of Claim 9 was properly exhausted.

Petitioner did not fairly present the Sixth Amendment aspect of Claim 9 on direct appeal. The Court concludes that this aspect of Claim 9 is technically exhausted but procedurally defaulted because it does not allege facts or law which would exempt it from preclusion and untimeliness pursuant to Rules 32.2(a)(3) and 32.4(a) of the Arizona Rules of Criminal Procedure were Petitioner to return to state court now. *See* Ariz. R. Crim. P. 32.2(b), 32.1(d)-(h); *Coleman*, 501 U.S. at 732, 735 n.1. Because Petitioner does not allege cause and prejudice or miscarriage of justice, the Sixth Amendment aspect of Claim 9 is procedurally barred. (*See* Dkt. 94 at 36.)

Discussion

Petitioner alleges there was insufficient evidence presented at trial to sustain his conviction for first degree murder and theft. (Dkt. 79 at 59.) Petitioner contends that the evidence is circumstantial and fails to establish guilt beyond a reasonable doubt. (*Id.* at 59-60.)

The Court has already considered Claims 6 and 7, concluding there was sufficient

evidence of premeditation for first degree murder and sufficient evidence of valuation for theft. Consequently, the Arizona Supreme Court's upholding of these specific elements was not contrary to or an unreasonable application of controlling federal law. The Court now turns to consider the remaining elements supporting Petitioner's first degree murder and theft convictions.

In Arizona, "[a] person commits first degree murder if: intending or knowing that his conduct will cause death, such person causes the death of another with premeditation." A.R.S. § 13-1105(A)(1) (West 1992). "A person commits theft if, without lawful authority, such person knowingly: controls property of another with the intent to deprive him of such property." A.R.S. § 13-1802(A)(1) (West 1992). The state court concluded there was sufficient evidence of these crimes based on the following: Petitioner brought his 9mm weapon with him on a one-way plane ticket from San Diego to Phoenix, paid for by the victim. While he was with the victim in Phoenix, she secured large cash advances from her credit cards. Petitioner was with the victim when she had the title to her truck notarized, which allowed it to be transferred to another person. The medical examiner testified that the victim died as a result of a gunshot wound to the back of her head and that she could have been killed on January 3rd or 4th, 1992, while Petitioner was with her in Arizona. The prosecution's ballistics expert testified that a spent shell casing found near the victim's body was fired from Petitioner's 9mm weapon. Petitioner drove the victim's truck back to San Diego, signed the title to himself, and was in possession of the truck when arrested in San Diego. *See Spears*, 184 Ariz. at 290-291, 908 P.2d at 1075-76.

Based on this evidence, a rational trier of fact could have found the essential elements of first degree murder and theft beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. The evidence is circumstantial but certainly sufficient. *See United States v. Shea*, 493 F.3d 1110, 1114 (9th Cir. 2007) (stating that circumstantial evidence and inferences drawn from the evidence are sufficient to sustain a conviction).

Petitioner cites *Bean v. Calderon*, 163 F.3d 1073, 1086-87 (9th Cir. 1998), to argue that this Court should not presume the accuracy of state court fact finding when those facts are

not fairly supported by the record. (Dkt. 79 at 61.) Petitioner argues further that the State cannot rely on factual inferences based on mere suspicion or speculation. (*Id.*)

*Bean*, a pre-AEDPA case, is not helpful to Petitioner. The *Bean* court ruled that the state court record fairly supported the inferences of guilt against petitioner. *Id.* Similarly, in this case, the factual basis in the trial record as found by the supreme court supports the inferences of guilt against Petitioner for theft and first degree murder. *See Spears*, 184 Ariz. at 290-291, 908 P.2d at 1075-76; *see also* 28 U.S.C. § 2254(e)(1) (factual determinations by a state court shall be presumed to be correct and petitioners have the burden of rebutting the presumption of correctness by clear and convincing evidence).

Based on the foregoing, the Arizona Supreme Court's conclusion that there was sufficient evidence of first degree murder and theft was not contrary to or an unreasonable application of clearly established federal law. Petitioner is not entitled to relief on Claim 9.

**Claim 10**

Petitioner alleges that Arizona's statutory death penalty scheme is unconstitutional because it allowed a judge, not a jury, to find the aggravating circumstances that rendered him death-eligible, and because it failed to require the state to provide notice of aggravating circumstances in his indictment. (Dkt. 79 at 63-64.) Respondents contend that only part of this claim is exhausted. Regardless of exhaustion, the Court will deny the entirety of this claim because it is plainly meritless. *See* 28 U.S.C. § 2254(b)(2); *Rhines*, 544 U.S. at 277.

Claim 10 is premised primarily upon *Ring v. Arizona*, 536 U.S. 584, 609 (2002), which found that Arizona's aggravating factors are an element of the offense of capital murder and therefore must be found by a jury. However, subsequently, in *Schriro v. Summerlin*, 542 U.S. 348 (2004), the Court held that *Ring* does not apply retroactively to cases already final on direct review. Because direct review of Petitioner's case was final prior to *Ring*, he is not entitled to federal habeas relief premised on that ruling.

With regard to his indictment claim, the Supreme Court has held that facts constituting the elements of an offense rather than just a sentencing enhancement must be charged in a *federal* indictment. *See Jones v. United States*, 526 U.S. 227, 252 (1999). However, the

Fifth Amendment Due Process Clause does not incorporate the same requirements upon state criminal prosecutions by virtue of the Fourteenth Amendment. *See Hurtado v. California*, 110 U.S. 516, 538 (1884); *Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972). Therefore, states are not required by the Constitution to empanel grand juries for purposes of indictment. *Id.* Based on these same principles, Petitioner's argument was rejected by the Arizona Supreme Court, which held that the federal constitution does not require that aggravating factors be alleged in an indictment and supported by probable cause. *See McKaney v. Foreman*, 209 Ariz. 268, 270, 100 P.3d 18, 20 (2004). This Court agrees. Claim 10 is without merit.

**Claims 12 and 14**

In Claim 12, Petitioner alleges that the trial court failed to properly consider and give mitigating weight to the evidence he presented at sentencing and improperly concluded that the lone aggravating circumstance outweighed all of the mitigating evidence presented. (Dkt. 79 at 73-75.) In Claim 14, he alleges that the Arizona Supreme Court, in its independent review of his death sentence, failed to properly consider and weigh the mitigating evidence when they concluded that the aggravating circumstance outweighed the mitigating evidence presented. (Dkt. 79 at 79-82.) According to Petitioner, the supreme court erred by failing to consider and by giving no weight to certain mitigation unless there was an established causal connection between the evidence and the crime. (*Id.*) Respondents concede exhaustion. (Dkt. 89 at 34.)

In capital sentencing proceedings, the sentencer, whether by statute or case law or any other legal barrier, must not be prevented from considering relevant mitigation evidence. *See Lockett v. Ohio*, 438 U.S. 586 (1978). In *Lockett*, and subsequently in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), the Supreme Court held that under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and may not refuse to consider, any constitutionally relevant mitigating evidence. *Eddings*, 455 U.S. at 113-14. Constitutionally relevant mitigating evidence consists of "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence

less than death." *Lockett*, 438 U.S. at 604. However, while the sentencer must not be foreclosed from considering relevant mitigation information, the Constitution does not require that a capital sentencer be instructed in how to weigh any particular fact in the capital sentencing decision. *See Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994). Nor does the Constitution require that a specific weight be given to any particular mitigating factor. *See Harris v. Alabama*, 513 U.S. 504, 512 (1995); *Eddings*, 455 at 114-15 ("The sentencer . . . may determine the weight to be given relevant mitigating evidence"); *Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998) (stating that the state is free to assess how much weight to assign mitigating evidence). Rather, the sentencer has broad discretion to determine whether death is appropriate once a defendant is found eligible for the death penalty. *Tuilaepa*, 512 U.S. at 979-80. In sum, giving a sentencer "discretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not unconstitutional. *Id.* (quoting *McCleskey v. Kemp*, 481 U.S. 279, 315 n.37 (1987)).

During habeas proceedings, this Court reviews the state court record to ensure that the state court allowed and considered all relevant mitigation. *See Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc). "The trial court need not exhaustively analyze each mitigating factor 'as long as a reviewing federal court can discern from the record that the state court did indeed consider all mitigating evidence offered by the defendant.'" *Moormann*, 426 F.3d at 1055 (quoting *Clark v. Ricketts*, 958 F.2d 851, 858 (9th Cir. 1991)); *see Parker v. Dugger*, 498 U.S. 308, 314-15, 318 (1991) (concluding that the sentencing court properly considered all information, including nonstatutory mitigation, where the court stated that it considered all the evidence and found no mitigating circumstances that outweighed the aggravating circumstances); *LaGrand v. Stewart*, 133 F.3d 1253, 1263 (9th Cir. 1998); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1044 (9th Cir. 1997).

At sentencing, the trial court found the existence of one aggravating factor – pecuniary gain under A.R.S. § 13-703(F)(5) (West 1992). (ROA 96 at 1-2.) The court further considered each of Petitioner's proffered mitigating factors. (*Id.* at 3-6.) The sentencing court found that Petitioner established lack of criminal history as a mitigating circumstance.

(*Id.* at 6-7.) Additionally, she gave "mitigating value" to the fact that Petitioner's mother loved her son, Petitioner's good demeanor in court and while incarcerated, his military service, and his psychological profile. (*Id.*) In determining that Petitioner's mitigating factors were not sufficiently substantial to call for leniency, the trial judge stated that she had "consider[ed] the defendant's character, his propensities, and lack of a criminal record and everything that is mitigating and potentially mitigating." (*Id.* at 7.)

On direct appeal, the Arizona Supreme Court carefully reviewed each of the trial judge's aggravation/mitigation findings. *Spears*, 184 Ariz. at 293-95, 908 P.2d at 1078-80. Stemming from childhood abuse, the court acknowledged expert testimony that Petitioner suffers from Post-Traumatic Stress Disorder (PTSD), that may be retriggered at any time, causing impulsive and irrational behavior. (*Id.* at 294, 908 P.2d at 1079.) However, because the murder in this case was planned and carried out in a deliberate manner, Petitioner's difficult family background and resulting PTSD diagnosis failed to explain why Petitioner committed murder. (*Id.*) The supreme court concluded that the trial judge appropriately gave Petitioner's background "minimal mitigating weight." (*Id.*)

The supreme court then conducted its own independent review of all the aggravation/mitigation evidence to determine if death was the appropriate penalty. The supreme court stated that it agreed

> with the trial court's findings that defendant committed this murder in expectation of pecuniary gain and that defendant's lack of a significant prior criminal record was a mitigating factor. In addition, we believe that the trial court appropriately gave some mitigating weight, however minimal, to defendant's difficult family background and his good conduct. However, we find that defendant's military history is a mitigating factor whereas the trial court stated that it was of only some mitigating value. Nonetheless, we believe that this minor distinction does not require us to remand this case for resentencing because there is no new evidence to be received, *no mitigating evidence was improperly excluded*, and the mitigating evidence is not significant. *See King*, 180 Ariz. at 288, 883 P.2d at 1044.

*Id.* at 295-96, 908 P.2d at 1080-81 (emphasis added). Regarding Petitioner's difficult family background, the court indicated that this evidence was not entitled to *significant* mitigating weight. *Id.* (emphasis added).

Citing *Tennard v. Dretke*, 542 U.S. 274 (2004), Petitioner argues that the trial and

- 40 -

appellate courts violated *Lockett* and *Eddings* by giving his troubled childhood and psychological history less mitigating weight because he failed to establish a causal connection between this evidence and the murder. (Dkt. 94 at 45.)  Under *Tennard*, Petitioner contends that the state court cannot reduce the mitigating weight of this evidence because the evidence did not have a causal connection to the crime.  (*Id.*)

In *Tennard*, the Supreme Court rejected the notion that mitigation evidence must pass through a threshold screening test before it may be *considered* as mitigation at sentencing. *Tennard*, 542 U.S. at 283-84.  The Court specifically held it is improper to screen out mitigating evidence on the basis that it did not have a causal connection with the crime. *Id.* at 287.  Following *Lockett* and *Eddings*, the *Tennard* Court focused on the requirement that courts must consider relevant mitigation evidence at sentencing.  *Id.* at 286-87.  Thus, even if mental health mitigation presented at sentencing does not have a causal connection to the crime, it still must be considered as mitigation.  *Id.*  However, the *Tennard* Court did not prescribe a certain *weight* that states must give to mitigating evidence.  *See Harris v. Alabama*, 513 U.S. 504, 512 (1995) (stating that the Constitution does not require that a specific weight be given to any particular mitigating factor).  Thus, under *Tennard*, the sentencer is not prohibited from determining the weight it will assign to mitigating evidence so long as the sentencer considers and gives effect to the mitigating evidence.

It is evident from the record that the state courts did not improperly violate *Lockett/Eddings* by foreclosing the consideration of Petitioner's difficult childhood and mental health mitigation.  *See Spears*, 184 Ariz. at 294, 296, 908 P.2d at 1079, 1081.  Both the trial judge and the Arizona Supreme Court carefully considered and gave effect to Petitioner's difficult family background and his mental health mitigation.  *Id.*  Both courts specifically stated that they were given weight.  *Id.*  The federal constitution requires nothing more; their decision to give this mitigation minimal mitigating weight is not unconstitutional. *See Harris*, 513 U.S. at 512; *Ortiz*, 149 F.3d at 943.  Therefore, the Arizona Supreme Court's decision was not based on an unreasonable determination of the facts or application of controlling federal law.  Petitioner is not entitled to relief on either Claim 12 or Claim 14.

**Claim 13**

2   Petitioner argues that the trial court impermissibly considered statements from the

3   victim's family that were attached to the probation department's presentence report and that

4   advocated for the death penalty. (Dkt. 79 at 75-79; *see* ROA-PCR 97.) Prior to sentencing,

5   the trial judge acknowledged reviewing the presentence report, but stated that irrelevant

6   information would be excluded from her consideration at sentencing. (ME 27.)

7   On direct appeal, Petitioner argued that consideration of the victim's family's

8   sentencing recommendations violated his constitutional rights. The Arizona Supreme Court

9   disagreed:

> The victim's parents attached a letter to the presentence report requesting that defendant receive "the maximum sentence allowable by the State of Arizona." Defendant argues that these statements violated the United States Constitution and the Arizona Constitution. While we acknowledge that family testimony regarding the appropriate sentence may violate the United States Constitution if presented to a capital sentencing jury, we also note that victim impact testimony is not relevant to any of our statutory aggravating factors. *State v. Bolton*, 182 Ariz. 290, 315-16, 896 P.2d 830, 855-56 (1995). When victim impact evidence is offered, we have generally assumed that the sentencing judge is capable of focusing on the relevant factors and setting aside the irrelevant, inflammatory, and emotional factors, absent evidence to the contrary. *Bolton*, 182 Ariz. at 316, 896 P.2d at 856. Because defendant offers no evidence from the record to rebut this assumption, we find no reversible error here.

17   *Spears*, 184 Ariz. at 292, 908 P.2d at 1077.

18   In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the

19   introduction of a victim impact statement to a capital sentencing jury violated the Eighth

20   Amendment. In *Payne v. Tennessee*, 501 U.S. 808, 827, 830 (1991), the Supreme Court

21   revisited *Booth* and overruled it in part, holding that the Eighth Amendment does not erect

22   a per se barrier to the admission of victim impact evidence before a capital sentencing jury

23   but leaving intact *Booth*'s prohibition on the admissibility of characterizations and opinions

24   from the victim's family about the crime, the defendant, or the appropriate sentence to be

25   imposed. *Id.* at 830 n.2.

26   Under Arizona law at the time of Petitioner's trial, the trial judge, rather than a capital

27   sentencing jury, determined the penalty in a capital case. A.R.S. § 13-703 (West 1992).

28   Judges are presumed to know and apply the law in a constitutional manner. *See Jeffers*, 38

F.3d at 415; *State v. Gulbrandson*, 184 Ariz. 46, 66, 906 P.2d 579, 599 (1995). Therefore, in the absence of any evidence to the contrary, the Court must assume that the trial judge properly applied the law and considered only admissible evidence at sentencing. *See Gretzler v. Stewart*, 112 F.3d 992, 1009 (9th Cir. 1997).

There is no evidence that the trial court disobeyed or misapplied the law and improperly considered the opinions of the victim's family when determining the sentence to impose. Indeed, the judge expressly stated that she would exclude from her consideration at sentencing any irrelevant information contained in the presentence report. (ME 27.) The decision of the Arizona Supreme Court finding no constitutional violation is neither contrary to nor an unreasonable application of clearly established federal law. Petitioner is not entitled to relief on Claim 13.

**Claim 15**

At trial and sentencing, Petitioner was represented by Roland Steinle and Timothy Ryan, Assistant Maricopa County Public Defenders. Petitioner contends they performed ineffectively by failing to: (A) conduct an adequate pre-trial investigation; (B) conduct an adequate investigation regarding prosecution witness Michael Smith;[10] (C) adequately investigate and present mitigation at sentencing; and (D) effectively challenge the pecuniary gain aggravating circumstance at sentencing. (Dkt. 79 at 82-96.) The Court has already concluded that these claims were properly exhausted. (Dkt. 120.)

**Claim 15-A**

Petitioner alleges that trial counsel failed to obtain a latent fingerprint expert to examine the 9mm shell casing found at the murder scene. (Dkt. 79 at 84-85.) He argues that the absence of his fingerprints on the shell casing would have cast doubt on his guilt. (*Id.*) Petitioner further alleges that trial counsel should have obtained an expert to examine the blood evidence taken from the murder scene and to examine a vest he allegedly wore on the

---

[10]    The merits of Claim 15-B are addressed in the Court's earlier discussion of Claim 5. *See supra.*

day of the crime.  (*Id.*)

Prior to trial, a prosecution expert examined the 9mm shell casing found at the murder scene.  He determined and testified that it was shot from the 9mm gun seized from Petitioner's apartment; however, he was not asked to do any fingerprint analysis on the casing.  (RT 12/3/92 at 833-34, 845-50.)

Dirt underneath the victim's body as well as a reddish pool of dirt down slope from the body tested positive for blood; however, it was not tested to verify that the blood was from the victim.  (RT 11/30/92 at 548-557; 12/1/92 at 636-42.)  Following his arrest, police seized clothing from Petitioner's apartment, including a nylon vest, that his girlfriend in San Diego claimed Petitioner had taken with him on his trip to Arizona.  (RT 12/7/92 at 29-37.)  A prosecution expert examined spots on the vest, but none tested positive for blood.  (*Id.* at 37-43.)

During PCR proceedings, Petitioner proffered an affidavit from a forensic expert, William Joe Collier, in support of this claim.  (ROA-PCR Doc. 157, Ex A.)  However, Collier did not opine regarding any testing for latent fingerprints on the shell casing; he only indicated that the prosecution did not process the shell casing for fingerprints.  (*Id.*)  Regarding the blood pool near the victim's body, Collier indicated that the prosecution should have taken photographs and made a comparison with the victim's blood.  (*Id.*)  With respect to Petitioner's vest, Collier indicated that the prosecution tested the item for blood and found no residue.  (*Id.*)  The PCR court rejected Petitioner's IAC allegations due to lack of *Strickland* prejudice.  (ROA-PCR 161.)

Petitioner acknowledged in his habeas petition that *Strickland* prejudice allegations were lacking and indicated that he would provide support for prejudice in his motion for evidentiary development. (Dkt. 94 at 49.)  However, Petitioner failed to provide any evidentiary support for this claim either in his motion for discovery/evidentiary hearing or in his motion for expansion of the record. (*See* Dkt. 102 at 9, 66-74; Dkt. 105 at 20-21, 23-27.)

Petitioner has failed to establish that an expert would testify that his fingerprints were

not on the shell casing. Even if counsel was deficient in not determining if the shell casing lacked Petitioner's fingerprints, Petitioner cannot establish that he suffered any prejudice from counsel's lack of investigation. Petitioner also failed to establish that an expert would testify that it was not the victim's blood at the murder scene. Even if counsel should have completed additional investigation and testing of the blood evidence from the scene, Petitioner has shown no prejudice from counsel's performance. Finally, Petitioner has failed to establish what additional investigation counsel should have conducted regarding his vest; the prosecution expert testified that it tested negative for blood. (RT 12/7/92 at 29-37.) Thus, Petitioner suffered no prejudice.

Conclusory allegations that are not supported by a statement of facts are insufficient to demonstrate *Strickland* prejudice. *See James*, 24 F.3d at 26; *see also Gonzalez v. Knowles*, 515 F.3d 1006, 1015-16 (9th Cir. 2008) (speculative allegations do not establish *Strickland* prejudice); *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (no prejudice from counsel's failure to retain an expert where no offer of proof detailing facts to which such expert would have testified at trial); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (same). Absent a showing of prejudice, Petitioner is not entitled to relief. The PCR court's decision denying these IAC allegations was neither contrary to nor an unreasonable application of *Strickland*. Petitioner is not entitled to relief on Claim 15-A.

**Claim 15-C**

Petitioner alleges that counsel performed deficiently at sentencing because they failed to adequately investigate his social, medical, and mental health history and failed to provide adequate information to his psychological expert so that his expert could properly present his mitigation. (Dkt. 79 at 87-95; Dkt. 94 at 49-63.) Petitioner alleges that the absence of this evidence negatively affected the expert's testimony at the presentence hearing. (*Id.*)

Background

Prior to sentencing, counsel prepared a detailed twenty-five page mitigation memorandum. (ROA 53.) This memorandum urged the judge to consider and weigh the following nonstatutory mitigation: Petitioner's lack of a prior felony criminal record, good

conduct while incarcerated and during trial, age, difficult childhood, employment history, remorse, lack of future dangerousness, cooperation with law enforcement, history as a good family man, military service in the Navy, concern for his mother and the fact that his family loves him, adoption of new goals, and any residual doubt about whether Petitioner committed the murder. (*Id.*)

At the presentence aggravation/mitigation hearing, counsel called psychologist Mickey McMahon and several lay witnesses. Dr. McMahon testified regarding two main areas: Petitioner's difficult childhood and the results of mental health testing showing a lack of future dangerousness. Concerning Petitioner's upbringing, Dr. McMahon described the physical beatings Petitioner suffered at the hands of his alcoholic father, including being shut in a closet for hours following one of the beatings. (RT 3/5/93 at 9-12.) Petitioner was terrified of his father and was referred for psychological treatment. (*Id.* at 12-15.)

Dr. McMahon testified to a statistical correlation between experiencing childhood abuse and subsequently becoming an abuser. (*Id.* at 15-16.) He diagnosed Petitioner as suffering from Childhood PTSD. (*Id.*) According to Dr. McMahon, Petitioner's PTSD may be re-triggered by trauma, at which time Petitioner would be inclined to act impulsively and reflexively. (*Id.* at 16.) Dr. McMahon also diagnosed Petitioner with depression, which was being treated with medication. (*Id.*) Based on his interview with Petitioner and information obtained from Petitioner's mother, Dr. McMahon did not believe that Petitioner had neurological problems. (*Id.* at 19.) Dr. McMahon testified that, although Petitioner engaged in attention-seeking behavior and was insecure, he was not chronically violent and likely would not be violent in prison. (*Id.* at 20-22.)

Petitioner's mother testified about his upbringing. She stated that Petitioner suffered severe physical abuse at the hands of his father, who whipped him and sometimes punched him with his fist, leaving bruises and welts. (*Id.* at 41-42, 51.) Petitioner's mother sometimes intervened; when she did, her husband would also physically abuse her by slapping, pushing, and punching her. (*Id.* at 42-44.) In one incident, after beating Petitioner with a belt and scuffling with his wife, Petitioner's father put Petitioner in a closet, closed

the door, and kept him there for hours. (*Id.* at 43-44.) His father was also strict about their clothes and hairstyle; Petitioner and his brothers always wore crew cuts even though this made them stand out among their peers. (*Id.* at 45.) While Petitioner was in elementary school, the school requested that Petitioner and his parents visit a psychiatrist or psychologist because Petitioner was terrified of his father. (*Id.* at 45-46.) These meetings stopped because Petitioner's father would not participate. (*Id.* at 46.) Petitioner left high school to join the Navy. (*Id.*) While he was in the Navy, his mother filed for divorce. (*Id.* at 47-48.)

Petitioner's San Diego girlfriend, JoAnn Rebecca Forrester, also testified. (*Id.* at 37.) She stated that when she met Petitioner, he was employed by her ex-husband and had a reputation for being dependable and hard working. (*Id.* at 37-38.) The business ultimately folded, and she did not see Petitioner for over a year; when they reconnected, he moved in with her. (*Id.*) According to Forrester, Petitioner was employed when they began living together. (*Id.*) However, when Petitioner lost this job, he began looking for work in San Diego and in Arizona. (*Id.* at 38-39.)

The court also heard testimony from a former employer, David Samuels. (*Id.* at 33.) Samuels indicated that he considered Petitioner a friend, that he liked him and socialized with him on the weekends, usually by riding motorcycles out in the desert. (*Id.* at 33-34.) Although happy with Petitioner's performance, Samuels had to lay-off Petitioner due to lack of work. (*Id.* at 34-35.) After the lay-off, Samuels testified that Petitioner continued to look for work but did not find steady employment. (*Id.* at 36.)

Petitioner also provided an unsworn statement at the hearing. (*Id.* at 51.) He described the childhood abuse he suffered from his father and how he enlisted in the Navy to get away from him. (*Id.* at 53-55.) Petitioner served in the Navy for eight years and received an honorable discharge, as well as commendations for his service. (*Id.* at 55-59.) While in the Navy, Petitioner's parents went through divorce proceedings. (*Id.* at 59-60.) During those proceedings, Petitioner intentionally overstayed leave so that he could protect his mother, who was being threatened by his father. (*Id.*) Due to being absent without leave, he lost a rank. (*Id.*)

Prior to sentencing, the trial judge also reviewed relevant aspects of the probation department's presentence report. (ME 27, 3/3/93 at 1.) The presentence report stated that Petitioner "adamantly denied killing the victim" and claimed he had no motive because the victim was his friend. (ROA 97 at 2.) Petitioner maintained, "I have been wrongfully accused and convicted of a crime I did not commit. I am bitterly disappointed and depressed with this whole situation." (*Id.* at 1.) One of Petitioner's attorneys confirmed to the presentence report writer that his client was "still denying involvement." (*Id.* at 3.)

As previously discussed with respect to Claims 12 and 14, the sentencing judge concluded that Petitioner established as a mitigating factor – lack of prior criminal history – and in weighing the mitigation evidence against the aggravation also gave mitigating value to the fact that Petitioner was loved by his mother, that he exhibited good demeanor in court and while incarcerated, that he had served in the military, and that he suffered from PTSD as a result of childhood abuse. (ROA-PCR 96 at 6-7.) Petitioner did not assert, and the sentencing judge did not find, that Petitioner's ability to control his conduct or to know the difference between right and wrong was significantly impaired. (*Id.* at 2-3, 7; *see* A.R.S. § 13-703(G)(1) (West 1993)).

On direct appeal, the Arizona Supreme Court agreed with the sentencing judge's mitigation findings, except that it determined that Petitioner's military history was a mitigating factor, whereas the sentencing court only gave it some mitigating value. *Spears*, 184 Ariz. at 295-96, 908 P.2d at 1080-81. In recounting Dr. McMahon's testimony – that Petitioner's PTSD could be retriggered and cause impulsive and irrational behavior – the court separately noted that Petitioner's "actions were planned and deliberate, not impulsive." *Id.* at 294, 908 P.2d at 1079.

In his PCR petition, Petitioner alleged that counsel's investigation into his mental health was inadequate because counsel failed to ask Dr. McMahon to explain how his mental impairment played a role in his behavior at the time of the crime. (ROA-PCR 157 at 18-19.) Petitioner further argued that Dr. McMahon should have required Petitioner to undergo neurological testing in search of potential mitigation. (*Id.* at 19-20.) Even though Petitioner

alleged that counsel was ineffective at sentencing, he failed to provide any evidentiary support in his PCR petition, despite the fact that he supported other deficient performance claims with evidentiary support. (*See* ROA-PCR 157, Ex. A, B.)

In denying relief, the PCR court stated:

> Defendant claims counsel was ineffective by doing "virtually nothing" to investigate defendant's mental impairment. There is nothing in the petition that indicates defendant has or had any mental impairment. It is incongruous for the defendant to claim counsel was ineffective because of a lack of investigation into the defendant's state of mind at the time the crime was committed when it was the defendant's position he did not commit the crime. Assuming such evidence should have been submitted, defendant offers nothing now to demonstrate how post-traumatic stress disorder or any other mental impairment played a role in his behavior.

> Defendant claims counsel's failure to present mitigating evidence entitles him to post-conviction relief. The defendant fails to indicate what mitigating evidence should have been submitted. What evidence is there in mitigation that was not presented? Who should have been called as a witness and what would they have said? Obviously, this claim does not rise to the level of being colorable.

(ROA-PCR 161 at 9.)

Discussion

In these proceedings, Petitioner alleged IAC because counsel failed to investigate and discover that, in addition to PTSD, he suffered from a Factitious Disorder, a Depressive Disorder, and Attention Deficit Hyperactivity Disorder (ADHD) prior to and at the time of the offense. (Dkt. 102 at 66.) Had counsel properly investigated, mental health professionals could have reported that his behavior was affected by these disorders at the time of the crime. (*Id.* at 67.) Petitioner further alleged that counsel should have investigated his history of head injuries and that doing so would have led to "evidence of frontal lobe dysfunction which would manifest behaviorally by disregulation of emotions and behavior, impulsivity and poor judgment." (*Id.* at 67, 73-74.) In addition, even though counsel interviewed some individuals who knew him, they failed to interview others who could have provided information related to violence and abuse in the Spears family, as well as Petitioner's history of "fabricating stories about himself." (*Id.* at 69, 72-73.) In order to provide evidentiary support for these allegations, Petitioner requested that this Court allow him to introduce new evidence that he did not present to the state courts. (*Id.*)

- 49 -

In March 2005, the Court denied Petitioner's request for discovery, an evidentiary hearing, and to expand the record with new evidence in support of his sentencing IAC allegations. (Dkt. 120 at 23-26.) Applying 28 U.S.C. § 2254(e)(2) of the AEDPA, this Court denied expansion of the record or the granting a federal evidentiary hearing unless Petitioner established that he had diligently attempted to develop the factual record in state court. (*Id.*)

The Supreme Court has construed the AEDPA to require that when available information would alert a reasonable attorney to the existence and importance of evidence, an attorney "fails" to develop the factual record if he does not make a reasonable effort to investigate and present that evidence to the state court. *See Williams*, 529 U.S. at 438-40 (counsel not diligent where put on notice of potential material evidence but conducted only a cursory investigation). If counsel fails to fully develop a claim in state post-conviction proceedings, such failure is imputed to the petitioner. *Id*. Because Petitioner failed in state court to act with diligence to develop these IAC sentencing allegations and did not attempt to meet the narrow exceptions of 28 U.S.C. § 2254(e)(2), this Court concluded that it was statutorily foreclosed from holding an evidentiary hearing or expanding the record to include new facts in support of Claim 15-C.[11] (Dkt. 120 at 25-26; *see Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (holding that introduction of new evidence into a habeas proceeding is permitted only if petitioner was not at fault in failing to develop the evidence in state court); *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241-42 (9th Cir. 2005) (denying expansion of the record because petitioner failed to present the new evidence in state post-conviction proceedings, therefore petitioner was barred from introducing it in habeas proceedings); *Wildman v. Johnson*, 261 F.3d 832, 839-40 (9th Cir. 2001) (denying expansion of new evidence into habeas proceeding because petitioner failed to develop evidence of *Strickland*

---

[11]     Petitioner conceded that he had failed in state court to fully develop the factual bases of Claim 15-C, but asserted that the failure should not be attributed to him because the State appointed incompetent PCR counsel to represent him. (Dkt. 102 at 67.) The Court disagreed, concluding that deficiencies by PCR counsel were imputed to Petitioner. (Dkt. 120 at 25.)

1   prejudice during state post-conviction proceedings)).

2       "Ordinarily, a [federal habeas] petition is limited to the factual record developed in state
3   court proceedings." *Cardwell v. J.D. Netherland*, 971 F. Supp. 997, 1008 (E.D.Va. 1997),
4   *aff'd, Cardwell v. Greene*, 152 F.3d 331 (4th Cir. 1998), *overruled, in part, on other grounds*,
5   *Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000) (en banc).  This is true because if the state courts
6   are the primary forum for direct and collateral review of state court convictions and
7   sentences, it would be inappropriate to allow a federal court to review state decisions on the
8   basis of a factual record that was not considered by the state court.  *Id.*; *see also Williams*,
9   529 U.S. at 437 ("Federal courts sitting in habeas are not an alternative forum for trying facts
10  and issues which a prisoner made insufficient effort to pursue in state proceedings.").

11      *Strickland* posits that habeas courts may proceed directly to the prejudice component
12  of an ineffectiveness claim if it is easier to dispose of an ineffectiveness claim on the ground
13  of lack of sufficient prejudice.  *Strickland*, 466 U.S. at 697. During state PCR proceedings,
14  Petitioner was required to support his allegations of deficient performance with specific
15  factual evidence establishing that counsel's performance at sentencing was prejudicial.  *Id.*
16  at 693.  Other than allegations of deficient performance, Petitioner did not attempt to and did
17  not present such evidence.  (ROA-PCR 157 at 19-20.)  The PCR court concluded that
18  Petitioner failed to affirmatively establish *Strickland* prejudice.  (*See* ROA-PCR 161 at 9.)
19   This Court agrees.  Based on the existing state court record, Petitioner's mere allegations
20  that counsel failed to investigate and present available mitigation at sentencing is insufficient
21  to establish *Strickland* prejudice.  *See James*, 24 F.3d at 26 (speculative and conclusory
22  allegations that are not supported by specific facts do not establish *Strickland* prejudice).
23  The Court concludes that the PCR court's ruling denying relief on Claim 15-C was not based
24  on an unreasonable determination of the facts or application of *Strickland*.

25      Alternatively, even considering the new evidence that Petitioner now presents, the Court
26  further concludes that he is not entitled to habeas relief.

27      *New Evidence*

28      In support of his habeas claims, Petitioner has proffered an extensive report from a

- 51 -

psychiatrist, Dr. Arturo Silva. Dr. Silva concludes that Petitioner was suffering from PTSD, a Factitious Disorder, a Depressive Disorder, and ADHD at the time of the offense. (Dkt. 103, Ex. Y at 6.) Dr. Silva indicates that Petitioner's depressive disorder arose from childhood abuse and the end of his second marriage, and that the factitious disorder began when Petitioner learned as a child to tell stories in order not to be severely punished by his father. (*Id.* at 15-16.) Friends and relatives all confirmed that Petitioner has a history of telling grandiose lies about himself. (*Id.* at 17-23.) Dr. Silva further reports that Petitioner displays a dramatic, longstanding pattern of deceiving others. (*Id.* at 38.) Dr. Silva's testing did not reveal evidence of cognitive deficits, executive dysfunction, or any dissociative disorder, and he determined that Petitioner has a full scale IQ of 104. (*Id.* at 28-30.)

With regard to Petitioner's state of mind at the time of the offense, Dr. Silva notes:

> Because Mr. Spears continues to deny any participation in the chain of events that led to the death of the victim, I need to acknowledge from the outset that often, I can only discuss potential psychiatrically related scenarios during and around the time of the victim's death. If Mr. Spears had stated to this examiner and others that he was responsible for the victim's death and additionally, had provided detailed evidence for his responsibility in her death, then my evaluation of Mr. Spears would have increased validity relative to my present evaluation.

(*Id.* at 51.) Dr. Silva theorizes that if the victim had threatened Petitioner in any manner or confronted him with his deceitfulness, his PTSD and depressive order may have caused him to lose control and become violent. (*Id.* at 52-53.) He further speculates that, if the victim had challenged Petitioner's inflated impression of himself by questioning his fantasies, Petitioner's factitious disorder could have led to a heat-of-passion-type situation in which he tried to prevent her from leaving him. (*Id.* at 53-54.) Finally, Dr. Silva hypothesizes that Petitioner's ADHD disorder may have diminished his impulse control and increased his hostility. (*Id.* at 54.)

Petitioner also proffers a quantitative electroencephalogram (qEEG) report prepared by neuropsychologists M.B. Sterman and Ricardo Weinstein. (Dkt. 105 at 24; Dkt. 103, Ex. Y.) This testing, apparently conducted as a "complement" to other neuropsychological testing, revealed "evidence of insult(s) to the brain resulting in frontal lobe dysfunction. This finding would be behaviorially manifested by disregulation of emotions and behavior, impulsivity

and poor judgement." (Dkt. 103, Ex. Y at 1, 9.) Petitioner has proffered no other evidence from his neuropsychological experts.

Finally, Petitioner has submitted numerous declarations from various family members and friends. His siblings, aunts, uncles, and cousins describe the abuse Petitioner suffered at the hands of both his father and mother, though the latter to a much lesser extent. (*Id.*, Ex. A-D, F, G, I, L.) His father was quick to discipline Petitioner, his oldest child, with a belt, switches, and even a car antenna that he pulled off during a family vacation. (*Id.*, Ex. E-G.) As a result, the children suffered physical and emotional abuse from their father. (*Id.*) Petitioner was known in the family as a respectful and dutiful son who did what he was told and was kind to those in his extended family. (*Id.*, Ex. A-D, I, L.) According to Petitioner's family members, his father was himself physically abused as a child and grew up in a home filled with anger, violence, mental illness, heart disease, and widespread alcoholism. (*Id.*, Ex. A-E.)

In their declarations, Petitioner's two ex-wives and his daughter describe Petitioner's positive traits: he was kind, compassionate, sensitive, and musically talented. (*Id.*, Ex. K, M, R.) Petitioner's first wife revealed that they divorced due to Petitioner's affairs with other women. (*Id.*, Ex. M.) Petitioner's second wife reported on Petitioner's escalating use of drugs (cocaine, amphetamines, alcohol, and marijuana), increased anger, depression, and inability to stay employed. (*Id.*, Ex. R.) Friends of Petitioner state that his use of drugs hardened him and some revealed that they no longer wanted to associate with him due to this change. (*Id.*, Ex. H, W.) A number of both relatives and friends commented on how Petitioner was known to make himself out to be bigger and better than he was by embellishing stories about himself. (*Id.*, Ex. E, R, S, T, V.)

*Performance*

The performance inquiry for an IAC claim is whether counsel's assistance was reasonable considering all of the circumstances. *Strickland,* 466 U.S. at 688-89. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption

that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Petitioner contends that counsel conducted virtually no mitigation investigation, but offers no support for this assertion from trial counsel, their investigator, or any other source familiar with his trial attorneys' preparation for sentencing. It is evident from the state court record that counsel enlisted a psychological expert and interviewed a number of lay witnesses familiar with Petitioner's social history. They prepared an extensive presentence mitigation memorandum urging the trial judge to consider numerous mitigating factors and presented four witnesses at the presentence hearing. They sought to portray Petitioner in a sympathetic light by emphasizing the abuse he suffered at the hands of his alcoholic father and the resulting post-traumatic stress disorder. They also focused on the positive aspects of his character and background, including familial love and support, military service, and the lack of any significant criminal history.

The crux of Petitioner's claim appears to stem from counsel's alleged failure to ask Dr. McMahon to evaluate Petitioner's mental state at the time of the crime and to have Petitioner examined for neurological damage, presumably to try and show that some mental disease or defect substantially impaired Petitioner's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law." A.R.S. § 13-703(G)(1) (West 1993).[12] Petitioner essentially argues that the failure to investigate his mental state of the time of the offense was *per se* ineffective. (Dkt. 79 at 88-89; Dkt. 94 at 54.) The Court disagrees.

---

[12]     Establishing that a capital defendant has significant impairment to his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law under A.R.S. § 703 (G)(1) has been found by the Arizona Supreme Court to be a substantial factor justifying a sentence of life imprisonment as opposed to death. *See, e.g.*, *State v. Trostle*, 191 Ariz. 4, 951 P.2d 869 (1997); *State v. Stuard*, 176 Ariz. 589, 863 P.2d 881 (1993); *State v. Jimenez*, 165 Ariz. 444, 799 P.2d 785 (1990); *State v. Mauro*, 159 Ariz. 186, 766 P.2d 59 (1988); *State v. Graham*, 135 Ariz. 209, 660 P.2d 460 (1983); *State v. Brookover*, 124 Ariz. 38, 601 P.2d 1322 (1979); *State v. Doss*, 116 Ariz. 156, 568 P.2d 1054 (1977).

Petitioner has not proffered any evidence from his trial attorneys to shed light on why they did not ask Dr. McMahon to opine about Petitioner's mental state at the time of the offense; nor has he proffered his own declaration regarding his willingness to participate in an assessment of his mental state at the time of the crime. However, it is evident from the presentence report that even after conviction Petitioner continued to deny criminal responsibility. (ROA 97 at 1-2; *see also id.* at 3 ("[Defense counsel] noted his client is still denying involvement.").) In addition, the report of Petitioner's newly-retained habeas expert states that Petitioner "continues to deny any participation in the chain of events that led to the death of the victim." (Dkt. 103, Ex. Y at 51.) Thus, there is a reasonable basis to believe that counsel, aware of their client's steadfast denial of guilt, recognized that Petitioner would not be willing to discuss any aspect of the offense with a mental health expert. Any unwillingness by Petitioner to discuss the crime would have prevented Dr. McMahon from conducting a reliable evaluation and making a diagnosis about his mental state at the time of the offense. *See Wellons v. Hall*, 554 F.3d 923, 930 n.2 (11th Cir. 2009) (observing that expert was unable to render opinion on mental state where defendant refused to discuss the facts and circumstances surrounding the offense); *see also Affinito v. Hendricks,* 366 F.3d 252, 260 (3d Cir. 2004) (noting critical importance of a defendant's statements regarding the crime to an expert evaluating mental state).

Furthermore, Dr. McMahon expressly stated that he did not observe any signs of neurological damage and did not recommend that Petitioner undergo a neurological evaluation. (RT 3/5/93 at 19.) "An attorney is not required to be so expert in psychiatry," *Pruett v. Thompson*, 996 F.2d 1560, 1574 (4th Cir. 1993), and counsel's reliance on Dr. McMahon, an experienced forensic psychologist, was objectively reasonable. *See Turner v. Calderon*, 281 F.3d 851, 876 (9th Cir. 2002) (explaining that the choice of what type of expert to use is one of trial strategy and entitled to deference and rejecting claim that counsel's use of a "general psychologist" rather than a more specialized expert constituted IAC); *Wildman v. Johnson*, 261 F.3d at 838 ("Trial counsel could reasonably rely on [the] initial expert investigation and Wildman did not show that the expert retained revealed that

further investigation would be productive."); *Campbell v. Coyle*, 260 F.3d 531, 555 (6th Cir. 2001) (counsel reasonably relied on a "trained psychologist" who failed to discover the petitioner's alleged post-traumatic stress disorder).

Even with the consideration of new evidence, Petitioner has failed to establish that counsel's decision to forgo evidence of Petitioner's mental state at the time of the crime was unreasonable. *Cf. Jeffries v. Blodgett*, 5 F.3d 1180, 1198 (9th Cir. 1993) (finding that the defendant's "unsworn denial of the crimes during his statutory allocution made his refusal to seek mitigation a logical strategy"). Because Petitioner's allegations of deficient performance are speculative and he has not shown that counsel's representation fell below prevailing professional standards, the PCR court's determination that Petitioner failed to establish deficient performance was not based on an unreasonable determination of the facts or application of *Strickland*.

*Prejudice*

In assessing prejudice for a sentencing IAC claim, the Court considers the totality of the mitigation, weighs it against the aggravation, and determines whether there is a reasonable probability that the sentence would have been different if the additional information had been presented. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

Even considering Petitioner's new evidence, the Court determines that he is not entitled to relief. In assessing whether there is a reasonable probability the outcome would have been different if counsel had presented this evidence at sentencing, this Court must consider the relevant provisions of Arizona's death penalty statute at the time Petitioner was sentenced: mitigating circumstances are any factors "relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense"; mitigation evidence can be presented regardless of admissibility and need only be proven by a preponderance; the burden is on the defendant to prove mitigation; and the court shall impose a sentence of death if it finds at least one aggravating circumstance and "no mitigating circumstances sufficiently substantial to call for leniency." A.R.S. § 13-703(C), (E), (G) (West 1993).

Arizona courts assess whether mitigating factors are proven and consider "the quality and strength of those factors." *State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006). Mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, but the lack of a causal connection may be considered in assessing the weight of the evidence. *Id.*; *State v. Hampton*, 213 Ariz. 167, 185, 140 P.3d 950, 968 (2006) (finding horrendous childhood less weighty and not sufficiently substantial to call for leniency, in part, because not tied to the offense). When the experts indicate that a defendant "knew right from wrong and could not establish a causal nexus between the mitigating factors and [the] crime," the Arizona courts may afford evidence of abusive childhood, personality disorders, and substance abuse limited value. *State v. Johnson*, 212 Ariz. 425, 440, 133 P.3d 735, 750 (2006).

The new information offered by Petitioner to support his IAC allegations is speculative and cumulative. Petitioner's new psychological expert acknowledged that his report is limited to "*potential* psychiatrically related scenarios during and around the time of the victim's death" because Petitioner continues to maintain his innocence and "repeatedly stated during his interviews with this examiner that during the estimated time period when the victim had died, he had not been in contact with her. He stated that he had no knowledge of any events that led to [her] death." (Dkt. 103, Ex. Y at 51, 8 (emphasis added).) Dr. Silva offers nothing more than speculation that Petitioner's PTSD and other disorders were a contributing factor to the victim's death, contrary to the Arizona Supreme Court's determination that Petitioner planned and deliberated the murder. *Spears*, 184 Ariz. at 294, 908 P.2d at 1079.

In addition, Dr. Silva's diagnosis does not differ significantly from that of Dr. McMahon. The trial court considered and weighed the fact that Petitioner suffered from PTSD and depression, and this Court concludes that the additional diagnoses of ADHD and Factitious Disorder do not significantly alter "the sentencing profile presented to the sentencing judge." *Strickland,* 466 U.S. at 700; *see Brown v. Ornoski*, 503 F.3d 1006, 1016 (9th Cir. 2007) (observing that attention deficit disorder is "somewhat common" and is not

"quality" mitigation). The same is true for the new evidence Petitioner has proffered concerning the abuse he suffered as a child. The fact of Petitioner's difficult childhood and abusive father was not in dispute at sentencing and was considered by the sentencing judge. *See Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995) (finding "of little value" additional facts regarding petitioner's difficult childhood where evidence of childhood abuse was presented at sentencing).

Petitioner also proffers results from a qEEG examination to support his claim that he suffers from frontal lobe dysfunction. Putting aside the questions of reliability and availability of qEEG testing at the time of Petitioner's sentencing, *see, e.g.*, Laura Stephens Khoshbin & Shahram Khoshbin, *Imaging the Mind, Minding the Image: An Historical Introduction to Brain Imaging and the Law*, 33 Am. J.L. & Med. 171 (2007), Petitioner has not established that his alleged neurological impairment prevented him from complying with the law or knowing right from wrong at the time of the crime; thus, it is not of significant mitigating weight. *See Johnson*, 212 Ariz. at 440, 133 P.3d at 750 ("[T]he weight to be given [to] mental impairment should be proportional to a defendant's ability to conform or appreciate the wrongfulness of his conduct.") (quoting *State v. Trostle*, 191 Ariz. 4, 21, 951 P.2d 869, 886 (1997)); *State v. Ellison*, 213 Ariz. 116, 144, 140 P.3d 899, 927 (2006) ("The relationship between the mitigation evidence and the crime . . . can affect the weight given to such evidence.") (citing *Newell*, 212 Ariz. at 405, 132 P.3d at 849). Petitioner has not proven that he suffers from a mental impairment which is a "major contributing cause" to his conduct at the time of the crime. *See State v. Stuard*, 176 Ariz. 589, 610, 863 P.2d 881, 902 (1993) (finding of significant weight and meriting leniency evidence of severe organic brain damage resulting in dementia and a borderline-retarded IQ that were significant causative factors in the murders). Furthermore, the Arizona Supreme Court expressly found that Petitioner murdered the victim in a planned and deliberate manner and that his actions were not impulsive. *Spears*,184 Ariz. at 294, 908 P.2d at 1079. Thus, the fact that Petitioner's frontal lobe dysfunction causes "impulsivity and poor judgment" (Dkt. 102 at 67) carries little mitigating value.

Speculative and conclusory allegations that are not supported by specific facts do not establish *Strickland* prejudice. *See James*, 24 F.3d at 26. The cumulative nature of the new information similarly limits its impact on the sentencing determination. *See Babbit v. Calderon*, 151 F.3d 1170, 1176 (9th Cir. 1998) (no prejudice where evidence omitted at sentencing was "largely cumulative of the evidence actually presented"); *see also Eddmonds v. Peters*, 93 F.3d 1307, 1322 (7th Cir. 1996) ("[W]e are certain counsel's failure to throw a few more tidbits from the past or one more diagnosis of mental illness onto the scale would not have tipped it in Eddmonds' favor."); *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) ("to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing").

*Conclusion*

The Court alternatively concludes that the PCR court's ruling denying relief on Claim 15-C was not based on an unreasonable determination of the facts or an unreasonable application of controlling federal law. Petitioner is not entitled to habeas relief.

**Claim 15-D**

Petitioner contends that trial counsel failed to adequately challenge the prosecution's evidence in support of the pecuniary gain aggravating circumstance at sentencing and that they should have presented additional witnesses and evidence on this issue. (Dkt. 79 at 95-96.) In support, Petitioner incorporates the arguments he presented as to Claim 11, which challenged the sufficiency of the evidence supporting the pecuniary gain aggravating circumstance.[13] (*Id.*) In Claim 11, Petitioner asserted that the victim's diary provided a more complete picture of the relationship between Petitioner and the victim, including that Petitioner had manipulated the victim's feelings for him to obtain money over a period of years. (Dkt. 79 at 69.) Based on the victim's history of providing him with financial

---

[13] The Court previously determined that Claim 11 is procedurally barred. (Dkt. 120 at 8-11.)

assistance, Petitioner asserted that he had no motive to kill her.  (*Id.* at 70-71.)

Background

Counsel filed a presentence memorandum arguing that the prosecution had not presented any evidence of motivation for the murder and that theft after the fact was not sufficient; therefore, the state had failed to establish that pecuniary gain motivated the murder.  (ROA 54.)  The trial court found beyond a reasonable doubt that Petitioner murdered the victim in order to obtain her vehicle and money.  (ROA 96 at 2.)  Specifically, the court found that Petitioner planned to take the victim's property "under the guise they would be running off together"; Petitioner claimed to have paid for the truck but had no income; the victim purchased two sleeping bags and withdrew $2,200 in cash advances on her credit cards; Petitioner returned to San Diego with new sleeping bags, the victim's truck and weapons, and over $1,000 in cash.  (*Id.*)  The Arizona Supreme Court affirmed the pecuniary gain factor, holding that "ample evidence shows that defendant murdered Jeanette as part of a preconceived plan to obtain her truck and her money."  *Spears*, 184 Ariz. at 292-93, 908 P.2d at 1077-78.

During state PCR proceedings, Petitioner alleged in a conclusory fashion that sentencing counsel's attack against the pecuniary gain aggravating circumstance was ineffective. (ROA-PCR 157 at 21.)  The PCR court held that counsel's performance was not deficient and that there was no *Strickland* prejudice.  (ROA-PCR 161.)

Discussion

In light of the state court's specific findings regarding pecuniary gain, the Court finds that Petitioner was not prejudiced by counsel's failure to rely on the victim's diary to dispute this aggravating circumstance.  Reliance upon the diary might have provided some support for counsel's argument that there was a lack of motivation for the murder.  However, the trial court's finding that pecuniary gain motivated the murder is not undercut by diary entries that Petitioner had successfully manipulated the victim in the past for money.  Rather, Petitioner's past manipulation provides additional support for the court's finding that Petitioner manipulated the victim for money prior to murdering her.  Therefore, there is not a

reasonable probability that the sentencing judge would not have found the pecuniary gain

aggravating factor if counsel had relied on information from the diary.

*State v. Milke*, 177 Ariz. 118, 127, 865 P.2d 779, 788 (1993), upon which Petitioner

relies, does not alter this conclusion. In *Milke*, the court concluded that pecuniary gain is not

proven beyond a reasonable doubt when there are conflicting inferences regarding the

motivation for the murder. As an initial matter, Petitioner has never suggested an alternative

motive for the murder; rather, he contends the State has not proven motive. To the extent

*Milke* reinforces the requirement that pecuniary gain must be found to be the motivating

factor for the murder beyond a reasonable doubt, the state court's findings satisfy that

requirement; the diary entries do not undermine the conclusion of the supreme court.

Because Petitioner fails to demonstrate prejudice, the PCR court's decision denying this

IAC claim was not contrary to or an unreasonable application of *Strickland*. Petitioner is not

entitled to relief on Claim 15-D.

**Claim 17**

Petitioner argues that the Arizona death penalty statute is unconstitutional in several

respects. (Dkt. 79 at 114-38.) Petitioner contends that the statutory scheme precludes

consideration of all relevant mitigation (Claim 17-A); it makes the death penalty mandatory

and establishes a presumption of death (Claim 17-B); it lacks standards for the sentencing

authority to follow (Claim 17-D); it denies the right to voir dire the sentencing judge (Claim

17-E); it allows the prosecutor unfettered discretion in determining whether to seek the death

penalty (Claim 17-F); it allows arbitrary and irrational imposition of the death penalty (Claim

17-G); it discriminates against young, male, poor defendants (Claim 17-H); and, finally, that

the death penalty constitutes cruel and unusual punishment (Claim 17-I). The Court has

already considered and concluded that Petitioner exhausted all of these challenges. (*See* Dkt.

120 at 13-14.) The Court rejects all of these claims in summary fashion, as follows.

Regarding Claim 17-A, the Ninth Circuit has explicitly rejected the contention that

Arizona's death penalty statute precludes the consideration of all relevant mitigation in

violation of *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104

(1982).  *See Jeffers v. Lewis*, 38 F.3d 411, 416-17 (9th Cir. 1994) (en banc).

Regarding Claim 17-B, in *Walton v. Arizona,* 497 U.S. 639, 651-52 (1990), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584 (2002), the Supreme Court rejected the claim that Arizona's death penalty statute is impermissibly mandatory and creates a presumption in favor of the death penalty because it provides that the death penalty "shall" be imposed if one or more aggravating factors are found and mitigating circumstances are insufficient to call for leniency.  497 U.S. at 651-52 (citing *Blystone v. Pennsylvania,* 494 U.S. 299 (1990); *Boyde v. California,* 494 U.S. 370 (1990)); *see Kansas v. Marsh,* 548 U.S. 163, 126 S. Ct. 2516, 2524 (2006) (relying on *Walton* to uphold Kansas's death penalty statute, which directs imposition of the death penalty when the state has proved that mitigating factors do not outweigh aggravators); *see also Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998) (summarily rejecting challenges to the mandatory quality of Arizona's death penalty statute).

Regarding Claim 17-D, the Constitution does not require that a capital sentencer be instructed in how to weigh any particular fact in the capital sentencing decision.  *See Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994).  Nor does the Constitution require that a specific weight be given to any particular mitigating factor.  *See Harris v. Alabama*, 513 U.S. 504, 512 (1995).  Rather, the state sentencer has broad discretion to determine whether death is appropriate once a defendant is found eligible for the death penalty.  *Tuilaepa*, 512 U.S. at 979-80.  Thus, Arizona's death penalty statute need not enunciate specific standards to guide the sentencer's consideration of aggravating and mitigating circumstances.  *See id.*; *see also Smith,* 140 F.3d at 1272 (summarily rejecting the challenge that the statute does not give the sentencer appropriate guidance).

Regarding 17-E, Petitioner cites no authority, let alone Supreme Court authority, to support his claim that the Constitution provides the right to *voir dire* the sentencing judge regarding the death penalty.  Although the Constitution requires that a defendant receive a fair trial before a fair and impartial judge with no bias or interest in the outcome, *see Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997),  trial judges, like other public officials, operate

under a presumption that they have properly discharged their official duties.  *See United States v. Armstrong*, 517 U.S. 456, 464 (1996); *see also State v. Perkins*, 141 Ariz. 278, 286, 686 P.2d 1248, 1256 (1984) (stating that a trial judge is presumed to be free of bias and prejudice).  The presumption of regularity applies to trial judges, absent clear evidence to the contrary.  *See Armstrong*, 517 U.S. at 464; *see also State v. Rossi*, 154 Ariz. 245, 248, 741 P.2d 1223, 1226 (1987) (mere possibility of bias or prejudice does not entitle a criminal defendant to *voir dire* the trial judge at sentencing).  As a result, this claim cannot form the basis for federal habeas relief. *See Williams*, 529 U.S. at 381; *Musladin*, 549 U.S. at 76.  The Petitioner made no allegation of bias or prejudice when he raised this issue before the Arizona Supreme Court.  (*See* Opening Br. at 74.)

Regarding 17-F, prosecutors have wide discretion in making their decision whether or not to pursue the death penalty.  *See McCleskey v. Kemp*, 481 U.S. 279, 296-97 (1987); *Gregg,* 428 U.S. at 199 (stating that pre-sentencing decisions by actors in the criminal justice system that may remove an accused from consideration for the death penalty are not unconstitutional).  In *Smith*, the Ninth Circuit likewise disposed of the argument that Arizona's death penalty statute is constitutionally infirm because "the prosecutor can decide whether to seek the death penalty." 140 F.3d at 1272.

Regarding 17-G, Petitioner argues that the death penalty statute is arbitrary and irrational because the state courts did not conduct a proportionality review of his sentence. (Dkt. 79 at 122-24; ROA-PCR 157 at 33-34.)  There is no federal constitutional right to proportionality review of a death sentence, *McCleskey*, 481 U.S. at 306 (citing *Pulley v. Harris*, 465 U.S. 37, 43-44 (1984), and Arizona discontinued the practice in 1992, *State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992).  The Ninth Circuit has explained that the interest implicated by proportionality review – the "substantive right to be free from a disproportionate sentence" – is protected by the application of "adequately narrowed aggravating circumstance[s]." *Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir. 1996).

Regarding 17-H, Petitioner alleges that at the time of his sentencing, the death penalty statute was applied in a way that discriminates against poor, young, male defendants in

violation of the Fourteenth Amendment. (Dkt. 79 at 124-25; ROA-PCR 157 at 34.) Clearly established federal law holds that "a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'" and must demonstrate that the purposeful discrimination "had a discriminatory effect" on him. *McCleskey,* 481 U.S. at 292 (quoting *Whitus v. Georgia,* 385 U.S. 545, 550 (1967)). Therefore, to prevail under the Equal Protection Clause, Petitioner "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id.* Petitioner does not attempt to meet this burden. This claim fails because he offers no evidence specific to his case that would support an inference that his gender, his age, or economic status impacted his sentence. *See Jeffers*, 38 F.3d at 419 (finding no evidence that race or gender creates a "constitutionally significant risk of impermissible bias" in Arizona capital sentencing).

Regarding 17-I, Petitioner challenges the death penalty as cruel and unusual punishment under the Eighth Amendment. (Dkt. 79 at 126-27.) Clearly established federal law holds that the death penalty does not constitute cruel and unusual punishment. *Gregg*, 428 U.S. at 169; *see also Roper v. Simmons*, 543 U.S. 551, 568-69 (2005) (noting that the death penalty is constitutional when applied to a narrow category of crimes and offenders). Further, the Supreme Court has found that it is within the province of state legislatures to assess the value of capital punishment; the Court concluded that "the infliction of death as a punishment for murder is not without justification and thus is not unconstitutionally severe." *Gregg*, 428 U.S. at 187.

The state courts denied all of Petitioner's death penalty challenges. (*Spears*, 184 Ariz. at 291, 908 P.2d at 1076; ROA-PCR 161.) Their decisions were neither contrary to nor an unreasonable application of controlling Supreme Court law. Petitioner is not entitled to relief for Claim 17.

## CONCLUSION

The Court concludes that Petitioner is not entitled to habeas relief on any of his claims. The Court further finds that an evidentiary hearing in this matter is neither warranted nor

required.[14] Therefore, Petitioner's First Amended Petition for Writ of Habeas Corpus must be denied and judgment entered accordingly.

### CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce resources that might be consumed drafting and reviewing an application for a certificate of appealability (COA) to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d at 864-65.

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability ("COA") or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of Claim 15-C – whether trial counsel rendered ineffective assistance by failing to adequately investigate and present available mitigation evidence at sentencing. Therefore, the Court issues a COA on this issue. For the remaining claims and procedural issues, the Court declines to issue a COA for the reasons set forth in the instant order and the Court's order of March 3, 2005. (Dkt.

---

[14] The Court previously denied Petitioner's request for evidentiary development as to specific claims (Dkt. 120), but conducted an independent review as to all the claims as required by Rule 8 of the Rules Governing Section 2254 Cases.

120.)

Based on the foregoing,

**IT IS HEREBY ORDERED** that Petitioner's First Amended Petition for Writ of Habeas Corpus (Dkt. 79) is **DENIED WITH PREJUDICE.** The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** vacating the stay of execution previously issued. (*See* Dkt. 3.)

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as to the following:

Whether this Court erred in denying evidentiary development in support of Claim 15-C and whether trial counsel rendered ineffective assistance by failing to adequately investigate and present available mitigation evidence at sentencing.

**IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, Arizona 85007-3329.

DATED this 14th day of September, 2009.

Stephen M. McNamee
United States District Judge